UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

LAMONT LEE and TYMEL KORNEGAY,

                            Plaintiffs,

           -v-                                     1:19-CV-473

THE CITY OF TROY; PATROLMAN
CHRISTOPHER PARKER; PATROLMAN
LOUIS PERFETTI; PATROLMAN JUSTIN
ASHE; PATROLMAN KYLE JONES;
PATROLMAN "JOHN" MORRIS; and
SERGEANT "JOHN" BARKER,

                            Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                                OF COUNSEL:

SIVIN, MILLER & ROCHE LLP           EDWARD SIVIN, ESQ.
Attorneys for Plaintiffs                 GLENN D. MILLER, ESQ.
20 Vesey Street, Suite 1400
New York, New York 10007

PATTISON, SAMPSON LAW FIRM      MICHAEL E. GINSBERG, ESQ.
Attorneys for Defendants              RHIANNON INEVA SPENCER, ESQ.
P.O. Box 208
22 First Street
Troy, New York 12181

OFFICE OF RICHARD T. MORRISSEY   RICHARD T. MORRISSEY, ESQ.
Attorneys for Defendants
64 Second Street
Troy, New York 12180

DAVID N. HURD
United States District Judge

## MEMORANDUM–DECISION and ORDER

## I.    INTRODUCTION

      On the night of March 3, 2018, plaintiff Lamont Lee ("Lee") was arrested outside a bar

in the City of Troy, New York ("Troy" or the "city") by several of the city's police officers.  It is

undisputed that the arresting officers used force to enact that arrest.  However, and perhaps predictably, the parties do dispute whether that use of force was reasonable.

But there is more.  On April 24, 2018, Lee and his grandson, plaintiff Tymel Kornegay ("Kornegay" and together with Lee "plaintiffs") had their car stopped by a different group of Troy police officers.  The officers had received two tips, one anonymous and one face-to-face, that a car of a roughly similar description to plaintiffs' carried two men who had just committed a robbery and were allegedly about to commit murder.  The investigating officers patted plaintiffs down and searched their car, which plaintiffs contend was an unreasonable search and seizure in violation of their Fourth Amendment rights.

On April 22, 2019, plaintiffs filed a complaint in the Northern District of New York alleging several claims for civil rights violations against Troy and the officers involved in those altercations:  Christopher Parker ("Parker"); Louis Perfetti ("Perfetti"); Justin Ashe ("Ashe"); Kyle Jones ("Jones"); Jeremy "John" Morris ("Morris") and Steven "John" Barker ("Barker" together with the city and the other officers "defendants").[1]  On October 20, 2020, defendants moved for summary judgment against all of plaintiffs' claims under Federal Rule of Civil Procedure ("Rule") 56.  On November 30, 2020, plaintiffs cross-moved for summary judgment in their favor under the same rule as to their own unreasonable search and seizure claims arising out of the April 24, 2018 stop.  Those motions having been fully briefed, they will now be decided on the basis of the parties' submissions without oral argument.

## II.   **BACKGROUND**

This case involves two distinct but—according to plaintiffs—connected encounters between plaintiffs and the Troy police department.  The first took place on March 3, 2018 (the "March 3 incident"), while the second took place on April 24, 2018 (the "April 24 incident").

---

[1] The complaint identifies Morris and Barker as "John" Morris and Barker.  The parties' motions, however, acknowledge these defendants by their given names.  This memorandum-decision and order will do the same.

However, before the Court can properly flesh out either incident, it must address some of the parties' missteps in presenting this case's factual universe.

### A.  <u>Defendants' Objections to Plaintiffs' Statement of Disputed Facts.</u>

According to Local Rule of the Northern District of New York ("Local Rule") 56.1(b), a party opposing a motion for summary judgment must admit or deny each paragraph of the movant's statement of material facts.  Because a naked denial of a fact the movant claims to be undisputed would do little to help the Court, the opposing party must support every denial with a citation to record evidence supporting a genuine dispute of material fact.  *Id.*  If the opposing party fails to provide that support, the Court may deem that fact admitted.  *Id.*

Defendants object to dozens of paragraphs of plaintiffs' response statement of material facts.  Those objections are best considered as falling into three loose categories.  Among the first, plaintiffs denied facts in which defendants only noted that an officer swore to a certain fact.  The second category includes paragraphs in which defendants contend plaintiffs injected arguments into paragraphs they functionally admitted, thus defeating the purpose of the admit/deny format mandated by Local Rule 56.1(b).  Third and finally, for a great many paragraphs, plaintiffs objected that video evidence defendants purported to submit to the Court could not accurately capture the entirety of Lee's interaction with police during the March 3 incident.

On the first point, a number of defendants' material facts amount to a statement that one of the officers swore to a certain fact in their affidavits.  For example, one paragraph of defendants' statement of material facts claimed:  "Ashe, . . . Jones[,] and . . . Perfetti attest that they did not hear . . . Lee state or warn that he was reaching into his pocket to obtain medication."  *See,* Dkt. 33-21, Defendants' Statement of Material Facts ("DSMF"), ¶ 22.  In response to that paragraph, plaintiffs responded:  "[p]laintiff[s] den[y] inasmuch as defendants

Ashe, Jones, and Perfetti's not hearing plaintiff Lee state or warn that he was reaching into his pocket to obtain medication amounts to an undisputed material fact that plaintiff did not in fact do so." Dkt. 38-2, Plaintiffs' Statement of Material Facts ("PSMF"), ¶ 22. The same pattern repeats itself among several similarly framed paragraphs. *See, e.g.*, DSMF ¶¶ 18, 22, 29, 30, 32-37, 61; PSMF ¶¶ 18, 22, 29, 30, 32-37, 60.[2]

As this Court has been forced to note all too frequently, the best practice would have been for plaintiffs to simply admit the fact and move on, trusting the Court to realize that plaintiffs were only admitting that the officers' affidavits made those claims, rather than admitting the truth of what the officers were claiming. *See Crawley v. City of Syracuse*, --- F. Supp. 3d ---, 2020 WL 6153610, at *6 (N.D.N.Y. Oct. 21, 2020) ("If the material fact proffered by the movant is (1) accurate and (2) supported by the citation on which it is based, the non-movant should just admit the statement and move on."). Instead, plaintiffs muddied the present motion practice by denying claims that they truly admit to repeatedly argue that the underlying factual events are still in dispute.

Plaintiffs were welcome to—and did—provide their own facts as evidence of a dispute as to what happened on the night of March 3 and the morning of April 24. *See* PSMF pp. 26-32. That was the proper time and place to advance plaintiffs' own narrative of the events at the heart of this case, not in response to defendants' own statement. Accordingly, to the extent that plaintiffs deny paragraphs 18, 22, 29, 30, 32, 33, 34, 35, 36, 37, and 61 for the sole purpose of disputing the truth of an attestation described in those paragraphs, the Court will disregard those denials and deem those paragraphs admitted.

---

[2] Plaintiffs' statement of material facts combines defendants' paragraphs 39 and 40 into one paragraph 39. *Compare* DSMF ¶¶ 39-40, *with* PSMF ¶ 39. Every subsequent paragraph in plaintiffs' response statement of material facts is off by one paragraph as a result.

Defendants' second objection is similarly valid.  Throughout their statement of material facts, plaintiffs repeatedly quibble with ancillary details in defendants' statement of material facts or else make argument instead of actually disputing the fact itself.  For example, in one paragraph plaintiffs admit that plaintiff Kornegay testified as defendants' statement of material facts described, but plaintiffs interject that Kornegay said more than defendants quoted.  PSMF ¶ 72 ("Plaintiffs admit that Kor[ne]gay testified to the above-mentioned events but denies that this constituted the full extent of his testimony concerning what he was instructed to do and/or what was done to him.").

In one notable paragraph, plaintiffs object to defendants acknowledging that Lee was speaking in a hypothetical because defendants did not satisfactorily convey—by plaintiffs' standards—the *degree* to which Lee was speaking hypothetically.  PSMF ¶ 67 ("Plaintiffs deny that Lee testified that he believed there 'could have been a possible early morning raid on somebody's home' in a purely literal sense; rather, he testified that his observation of the number of armed officers caused him to surmise that the scene '*was looking like it* could have been a possible early morning raid on somebody's home,' *in a figurative sense*." (emphasis added)).  Once again, there are many similar examples.  PSMF ¶¶ 18, 19, 21, 31, 55, 60-61, 69-70, 74.

It is not the purpose of a statement of material facts to allow the parties a battleground to fight over the phrasing of claimed facts.  The purpose is to clarify the issues in dispute for the Court to focus on the heart of the parties' disagreement.  *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001).  The Court will therefore disregard plaintiffs' ancillary arguments in paragraphs 18, 19, 21, 31, 55, 60, 61, 67, 69, 70, 72, and 74, and will only consider their statement of material facts to the extent that they properly deny a fact defendants claim to be undisputed.  *See, e.g.*, *Baity v. Kralik*, 51 F. Supp. 3d 414, 418

(S.D.N.Y. 2014) (admonishing plaintiff for interjecting arguments into statement of material facts and exceeding proper scope of Rule 56.1(b) statement).

Yet there is one more category of denials to which defendants object that must be addressed.  In quite a few paragraphs, plaintiffs deny that the surveillance video of the March 3 incident, one of the most important pieces of evidence at the parties' disposal, depicts the events of the March 3 incident accurately enough to support defendants' claims. PSMF ¶¶ 11-14, 17-19, 23-28, 31-37, 43.  Once again, rather than repeating a sizeable boilerplate about the video's inability to completely and accurately portray the March 3 incident, plaintiffs should have provided a citation to record evidence indicating that defendants' narrative was disputed or else admitted the fact supported by the video.  For example, plaintiffs could have cited to Lee's deposition testimony where it contradicted defendants' framing of the facts.  Alternatively, plaintiffs could have submitted an affidavit by Lee presenting a conflicting narrative and cited to that.  Plaintiffs did neither.

In the absence of a citation to record evidence, it is easy to get the impression that plaintiffs are not disputing facts so much as wishing them away.  Once again, the Court could deem these paragraphs of defendants' Rule 56.1(a) statement admitted, which would spell disaster for plaintiffs' claims stemming from the March 3 incident.  Local Rule 56.1(b). However, fortunately for plaintiffs, defendants' own submissions are just as imperfect.

Specifically, defendants have failed to provide the Court with the video evidence on which these paragraphs rely.  Although defendants submitted a disc purporting to contain the surveillance video from the night of March 3, that disc contained only a video of a police interview that is largely ancillary to this case.  Even so, the Court afforded defendants an opportunity to correct this mistake.  Dkt. 43.  Defendants' attempt to capitalize off of that opportunity amounted to sending the Court an entirely nonfunctional disc.

6

In other words, defendants' citations in their statement of material fact relying on the surveillance video are citations to evidence that is not in the record.  DSMF ¶¶ 11, 14-16, 24-25, 28, 31, 39.  By extension, although it is true that plaintiffs violated Local Rule 56.1(b) by failing to properly cite to record evidence refuting the material facts put forward by defendants, defendants themselves violated Local Rule 56.1(a) by failing to cite to record evidence in supporting their claim of an undisputed material fact.  *See* FED. R. CIV. P. 56(c)(1) ("A party asserting that a fact cannot be . . . genuinely disputed must support the assertion by . . . citing to particular parts of materials *in the record* (emphasis added)).  In the absence of functional video evidence in the record, defendants' summary judgment motion for the March 3 incident must be decided based only on the other available evidence.

### B. The March 3 Incident.

Having set the stage by establishing the evidence upon which the Court can rely, the Court at last turns to unwrapping the story that evidence tells.  To that end, on the night of March 3, 2018, defendant police officers Ashe, Perfetti, Parker, and Jones were conducting surveillance in Troy.  DSMF ¶ 8.[3]  Specifically, recent complaints of narcotics activity and a witness report of the same drew the city's eyes to a bar called Vivian's Lounge ("Vivian's").  *Id.* ¶ 9.

While monitoring the area around Vivian's, Ashe observed what he perceived to be a "hand-to-hand narcotics transaction" between two men outside of the bar.  DSMF ¶ 10; Dkt. 33-11 ("Parker Aff."), ¶ 14 (noting second male involved in alleged transaction).  One of those two men was plaintiff Lee.  DSMF ¶ 17.  Contrary to Ashe's perception of the

---

[3] The facts are taken from defendants' statement of material facts where admitted by plaintiff, or from other record evidence.  Disputed facts are flagged and supported by citations to either the proponent's statement of material facts or to record evidence.

interaction, Lee claims he was only at Vivian's to socialize, and was simply making conversation at the time Ashe spotted him.  Dkt. 33-3 ("Lee Dep."), p. 20.[4]

Nevertheless, the four officers believed that Ashe had seen enough and all four converged on Lee and one of the people he was interacting with.  DSMF ¶ 12.  Perfetti was first to arrive and directed both men to put their hands against the wall.  *Id.* ¶ 13.  The other three officers arrived on the scene not long after Perfetti did.  *See id.* ¶¶ 14-16.

On Perfetti's orders, Lee put his hands against the wall, but then began to reach toward his waistband with one of his hands.  DSMF ¶ 18.  According to Lee, he told the police that he had nothing on his person except for his blood pressure medication.  Lee Dep. 26. Thus, he explains, he reached for his pocket only to pull the medication bottle out to demonstrate.  Conversely, Ashe, Jones, and Perfetti all affirm they did not hear Lee mention his medication.  Dkt. 33-13 ("Ashe Aff."), ¶ 18; Dkt. 33-14 ("Jones Aff."), ¶ 18; Dkt. 33-15 ("Perfetti Aff."), ¶ 19.

In either case, the parties agree that Ashe snatched Lee's hand as it extended toward his pocket.  Ashe Aff. ¶ 20; Lee Dep. 27.  But after that, the parties' narratives depart sharply. According to Lee, the other officers then also grabbed him roughly.  Lee Dep. 27.  Lee tried to ask them to "be a little bit more easy" because he had recently had spinal surgery.  *Id.* Instead, Lee maintains that the officers twisted his arm and began striking him with their knees.  *Id.* at 34.  Lee claims that eventually the fourth officer, who had been supervising the other arrestee, came over and put him in a choke hold.  *Id.* at 31.  While Lee was being held, the other officers apparently rifled through his pockets.  *Id.*

Eventually, the officers dragged Lee to the ground.  Lee Dep. 32.  Pressed under all four officers' weight, Lee could not easily discern what they were doing.  *Id.* at 35.  All he

---

[4] Pagination corresponds with CM/ECF.

remembers feeling at the bottom of the pile was one heavy blow to the back of his head.  *Id.* at 35, 37.  The force of the blow drove Lee's head into the concrete, which according to him caused a hematoma and a laceration on his left eyebrow.  *Id.* at 38-39.  Lee does not recall whether any police officers told him to place his hands behind his back before the blow fell. *Id.* at 38.

In sum, Lee claims that he suffered a laceration and hematoma to his eyebrow, bruises to his legs, and a cervical injury in his neck and lower back.  Lee Dep. 39-41.  His lower back injury has required surgery.  *Id.* at 40.  As a consequence of the March 3 incident, Lee claims that he suffers from ongoing neck pain and severe headaches.  *Id.* at 41.

Although defendants do not dispute the bones of the events Lee describes, the narrower details of the March 3 incident invite a more robust debate.  According to defendants, Ashe first grabbed Lee's hand as it stretched for his pocket because Ashe was concerned Lee might be reaching for a weapon.  Ashe Aff. ¶ 19.  When Ashe's hand closed on Lee's wrist, he claims that Lee turned towards him and tensed threateningly.  *Id.* ¶ 20. Jones, who had also arrived on the scene to help his fellow officers arrest Lee, attempted to grab Lee's other wrist.  *Id.* ¶ 21.

Yet according to defendants, Lee tried to hide his hands in his pockets and refused to follow the officers' directions.  Ashe Aff. ¶ 22.  At this point, Parker left the other arrestee and grabbed Lee around his neck and upper body.  *Id.* ¶ 23.  Defendants claim Lee continued to pull his hands away from the officers and tried to break their hold on him to escape.  *Id.* ¶ 24.

The officers changed tactics, and successfully took Lee to the ground.  Ashe Aff. ¶ 26. Even still, the officers claim plaintiff buried his hands under his body and refused to comply. *Id.*  According to arresting officer Jones, Lee ignored his orders to put his hands behind his back and instead defiantly insisted that he would not be arrested.  Jones Aff. ¶ 28.  Parker

claims that while he and the other officers were struggling with Lee on the ground, he felt Lee tugging on his pistol, which he believed to be an attempt to pull it free of its holster.  Parker Aff. ¶ 27.  Parker warned the other officers about Lee's alleged attempt to grab his duty weapon.  *Id.*

Even after Lee allegedly groped for Parker's weapon, the struggle between Lee and the officers on the ground persisted for another forty-five seconds.  Ashe Aff. ¶ 28.  During that time, Jones claims he began to strike at Lee's left bicep and shoulder with his palm to try to draw Lee's arm from under his belly to behind his back.  Jones Aff. ¶ 30.  Perfetti also acknowledges that he kneed Lee in the upper thigh in an attempt to dislodge that arm. Perfetti Aff. ¶ 30.

At this point, Jones claims he heard Ashe yell that he could not see Lee's hand as it was going to his waist, though Ashe did not affirm having said so.  *Compare* Jones Aff. ¶ 32 ("At one point, [Jones] heard . . . Ashe fearfully and loudly yell 'I can't see his hand.  He's going for his waist.  I don't know what he is reaching for.'"), *with* Ashe Aff. ¶¶ 27-30 (describing final stages of Lee arrest without mentioning fear of not being able to see Lee's hand).  Jones asserts he then struck Lee's left shoulder and back twice with his knee to further dislodge his arm.  Jones Aff. ¶ 33.  Perfetti apparently followed suit, and kneed Lee a third time.  Perfetti Aff. ¶ 32.

Finally, the officers got Lee's arms behind his back and handcuffed him.  Perfetti Aff. ¶ 32.  A search of Lee and the area surrounding the arrest uncovered a leafy substance that tested positive for marijuana and three Hydrocodone/acetaminophen pills on Lee's person.  Ashe Aff. ¶¶ 32-33.  In addition, the police found cocaine on the ground nearby.  *Id.* ¶ 34.

The parties agree that the officers next took Lee back to their police station, where the Troy Fire Department treated his injuries.  DSMF ¶ 42.  According to Lee, the desk sergeant on duty refused to book him because of the condition of his face.  Lee Dep. 44.  Instead, Lee claims the desk sergeant directed that he be taken to a nearby hospital for examination and treatment.  *Id.* at 45.  Once there, Lee's cuts were cleaned and bandaged, and he was released without needing stitches.  DSMF ¶ 42.

On March 8, 2018, Lee pled guilty to one count each of:  (1) criminal possession of a controlled substance in the seventh degree; (2) resisting arrest; and (3) loitering in the first degree.  DSMF ¶ 48.  His guilty plea bought him an agreed-upon sentence of time served, as well as three years' probation.  *Id.*  Even so, Lee unsuccessfully attempted to withdraw that plea.  *Id.* ¶¶ 52-54.  He later appealed his sentencing court's denial of his motion to withdraw his plea, but that appeal was never perfected.  *Id.* ¶ 55.  Lee sought out a complaint form to air his grievances about defendants' use of force during the March 3 incident, but never filed any formal complaint.  DSMF ¶ 58; Lee Dep. 90.

### C. **The April 24 Incident.**

The morning of April 24, 2018 began peacefully enough for Lee and his grandson, plaintiff Kornegay.  Lee had a doctor's appointment, and Kornegay planned to drive him. DSMF ¶ 67.  But the brakes in Kornegay's truck were acting up, so plaintiffs drove together to Lee's daughter's house on Ida Street to see about borrowing Lee's daughter's car. Lee Dep. 73.  Lee's daughter agreed, and handed plaintiffs the keys to her Nissan, which different observers have described as gray or silver.[5]  *Id.* 74-75; Dkt. 33-4 ("Kornegay Dep."),

---

[5] Kornegay describes the car as silver, but Lee describes it as gray.  *Compare* Kornegay Dep. 20, *with* Lee Dep. 74.

p. 20.  Plaintiffs were getting in the car when an unmarked police vehicle drove by.[6]
Lee Dep. 75.

But if the start of plaintiffs' day was peaceful, for the Troy police it was nothing short of chaotic.  At about 9:52 a.m., a man named Oliver James ("James") approached police officers and told them that two African American males armed with a handgun had robbed someone and were now circling a nearby city block.  DMSF ¶ 61.   In the same timeframe, an unidentified informant called police dispatch claiming that a small gray Toyota with two males inside tried to "roust" someone else with a gun.  DMSF ¶ 62.  The informant elaborated that the altercation occurred in the area near Ida Street[7] and the two assailants were "looking to shoot" the man they had rousted.  *Id.*

As might be guessed, this is where the two stories converge.  The unmarked police car plaintiffs noticed also saw them and recognized certain similarities between plaintiffs' vehicle and the anonymous tips.  DSMF ¶ 63.  Presumably on this officer's report, eight of the city's police officers swiftly converged on plaintiffs' car for a high-risk vehicle stop.  *Id.* ¶ 64.

Apparently, such a large force of police officers piqued Lee's curiosity.  Lee Dep. 78.  Lee got out of the car to find out why eight armed policemen were descending on the neighborhood.  *Id.*  As he promptly found out, though, the officers were there to investigate him, and immediately ordered him not to move.  DSMF ¶ 69.  The officers directed Lee to

---

[6] Plaintiffs claim that the car was parked on Hill street at the time they entered it and cite Kornegay's deposition testimony to that end.  PSMF ¶ 62.  As best the Court can glean, plaintiffs rely on a redacted portion of Kornegay's deposition, and thus the Court is not equipped to verify that detail.  Because it is plaintiffs' burden to cite to record evidence to establish that a fact is in dispute, FED. R. CIV. P. 56(c)(1), the Court must rely on defendants' supported statement that the car was located "in the area of Ida Street,"  DSMF ¶ 62.

[7] James described the assailants as "circling the block . . . in the area of Third Street and Jefferson Street."  DSMF ¶ 61.  As permitted by Federal Rule of Evidence 201, the Court takes judicial notice of the fact that Jefferson Street, Third Street, Ida Street, and Franklin Street form a block.  GOOGLE MAPS, https://www.google.com/maps/place/Ida+St,+Troy,+NY+12180/@42.7202903,-73.6922781,17.75z/data=!4m5!3m4!1s0x89de0f1a950bcbe9:0x39b688a8d0e4643c!8m2!3d42.7200977!4d-73.6901708 (last accessed February 16, 2021).

raise his hands, turn around, and walk backwards three steps toward them.  *Id.*  Once Lee

had approached the officers as ordered, they told him to kneel, then lay flat on his stomach

with his hands behind his back.  *Id.*  After Lee was on the ground, the officers approached

and handcuffed him.  *Id.*  The officers then issued the same orders to Kornegay.  *Id.* ¶ 73.

Kornegay similarly complied.  *Id.*

Having secured plaintiffs, the officers patted them down and searched their car.

DMSF ¶ 71; Kornegay Dep. 27.  While some officers were looking into the car, the rest sat

plaintiffs down in police vehicles and questioned them.  DMSF ¶¶ 70, 73.  Kornegay

remembers being questioned about a robbery, and denying any involvement.

Kornegay Dep. 28.  Lee's deposition did not mention any questions about the robbery.  *See*

*generally* Lee Dep. *passim.*  Having found no weapons or any other clue that a crime was

afoot, the officers asked plaintiffs if anyone would have had motive to put in a false call

against them.  DSMF ¶¶ 70, 74.

At that point, any further investigation appeared to be fruitless, and the investigating

officers released plaintiffs.  DSMF ¶¶ 71, 75.  Plaintiffs each testified at deposition that they

were cuffed and seated for about ten minutes, and Kornegay estimated that the entire

encounter lasted about twenty.  *Id.*  Plaintiffs continued on to Lee's appointment without

further issues.  *Id.* ¶ 75.

Of the eight officers present for the stop, only two would become defendants in this

case:  patrolman Morris and Sergeant (now Captain) Barker.  DSMF ¶ 64.  Both Morris and

Barker affirmed they had no knowledge of the March 3 incident on April 24.  *Id.* ¶ 60.  Ashe,

Perfetti, Jones, and Parker have all also affirmed that they did not discuss the March 3

incident with these defendants.  *Id.* ¶ 59.

**D.  Procedural History.**

On April 22, 2019, plaintiffs filed a complaint in this district against defendants.  Dkt. 1. That complaint stated eight causes of action best understood as falling into three categories. The first category includes the claims dealing with the March 3 incident, and are brought only by Lee.  Those counts are:  (I) assault and battery under the New York common law against Parker, Perfetti, Ashe, Jones, and municipal defendant Troy; and (II) excessive force and unreasonable search and seizure in violation of the Fourth Amendment as incorporated by the Fourteenth Amendment under 42 U.S.C. § 1983 ("§ 1983") against Parker, Perfetti, Ashe, and Jones.

The second category encompasses Counts III-V.  Those counts are again all brought by Lee, but this time they relate to the April 24 incident.  Those counts are:  (III) assault and battery under the New York common law against Morris, Barker, and Troy; (IV) excessive force and unreasonable search and seizure under § 1983 against Morris and Barker; and (V) retaliation under the First Amendment as incorporated by the Fourteenth Amendment under § 1983 against Morris and Barker.

Finally, Counts VI-VIII are identical in all respects to Lee's claims under Counts III-V, but are raised by Kornegay instead of Lee.  As such, the final three counts are:  (VI) assault and battery under the New York common law against Morris, Barker, and Troy; (VII) excessive force and unreasonable search and seizure under § 1983 against Morris and Barker; and (VIII) retaliation under the First Amendment as incorporated by the Fourteenth Amendment under § 1983 against Morris and Barker.

Defendants did not move to dismiss any of plaintiffs' claims.  Instead, the first wave of motion practice in this case crested on October 20, 2020, when defendants moved for summary judgment against the complaint in its entirety.  Dkt. 33.  Plaintiffs followed suit on

November 30, 2020, cross-moving for summary judgment in their favor on Counts IV and VII to the extent they state a claim for unreasonable search and seizure.  Dkt. 38.

## III.   LEGAL STANDARD

### A.  Summary Judgment.

Under Rule 56, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists.  *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006).  If, and only if, the moving party meets this burden, the burden shifts to the nonmoving party to point to evidence supporting a dispute of facts.  *Id.* at 273.

The nonmoving party must do more than "rest upon the mere allegations . . . of [the plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 & n.11 (1986).  Instead, a dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether there is a genuine issue of material fact, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).  In short, summary judgment asks whether a trial is truly needed to resolve the parties' dispute, and the parties must either "put up or shut up."  *Weinstock v. Colum. Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

### B.  Section 1983.

Section 1983 allows plaintiffs to recover monetary damages from state actors who violate their civil liberties.  42 U.S.C. § 1983.  The common elements to all § 1983 claims are: "(1) the conduct complained of must have been committed by a person acting under color of state law; and (2) the conduct complained of must have deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States."  *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994).  Similarly common to all § 1983 claims is the defense of qualified immunity, which was crafted by the Supreme Court to safeguard § 1983's purpose of providing a check on unlawful governmental conduct while allowing legitimate government operations to proceed without disruptive lawsuits.  *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 250 (2d Cir. 2001).

### C. <u>Qualified Immunity.</u>

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct."  *Brown v. City of New York*, 862 F.3d 182, 190 (2d Cir. 2017) (citing *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).  Functionally speaking, determining whether to grant qualified immunity to a defendant requires a court to consider:  (1) "whether the evidence, viewed in the light most favorable to the plaintiff, makes out a violation of a statutory or constitutional right"; and (2) "whether that right was clearly established at the time of the alleged violation."  *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010).

"To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  *Brown*, 862 F.3d at 190 (cleaned up and internal citations and quotation marks omitted).  The borders of those rights can become clearly established through controlling caselaw, but "existing precedent

must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

However, the Supreme Court cautions that lower courts are "not to define clearly established law at a high level of generality," *al-Kidd*, 563 U.S. at 742, but must instead consider the particular circumstances of the case, *Brown*, 862 F.3d at 190.  At bottom, a court should only grant summary judgment in an officer's favor on the basis of qualified immunity if "the only conclusion a rational jury could reach is that reasonable officers would disagree about the legality of the defendant's conduct under the circumstances." *Cugini v. City of New York*, 941 F.3d 604, 615 (2d Cir. 2019) (cleaned up and internal citations and quotation marks omitted).  In practice, the qualified immunity inquiry is intended to shield "all but the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015).

## IV.   DISCUSSION

As discussed above, defendants argue that plaintiffs have failed to identify any triable issues of fact across all eight counts.  Plaintiffs agree that there are no triable issues of fact as to their § 1983 illegal search and seizure claims for the April 24 incident, but they argue that they are the ones entitled to summary judgment, not defendants.  For clarity's sake, plaintiffs' claims will be grouped together by incident.

### A.  Lee's March 3, 2018 Claims.

Defendants first dispute that Lee has successfully created a question of fact as to their use of force during the March 3 incident.  According to defendants, their use of force was called for by Lee's ongoing resistance to arrest and his groping for Parker's gun.  As for Lee's illegal search and seizure claims, defendants argue that those claims are foreclosed by Lee's eventual guilty plea related to this encounter.  For both claims, defendants argue that they

are entitled to qualified immunity.  Plaintiffs disagree, because they argue that a reasonable jury could conclude that defendants acted unreasonably in violation of clearly established law.

### 1. <u>Section 1983: Excessive Force.</u>

A claim against police for using excessive force during an arrest or investigatory stop of a free citizen "is most properly characterized as one invoking the protections of the Fourth Amendment." *Cugini*, 941 F.3d 612 (citing *Graham v. Connor*, 490 U.S. 386, 394 (1989)). As a result, a pre-conviction excessive force claim is subject to that Amendment's objective "reasonableness" standard. *Cugini*, 941 F.3d at 612.  As an objective test, a court should disregard the "underlying intent or motivation" of the officers and avoid using "the 20/20 vision of hindsight." *Id.* (citing *Graham*, 490 U.S. at 396-97).

That standard tasks courts with balancing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Cugini*, 941 F.3d at 612.  According to the Supreme Court, that balancing test looks "to the facts and circumstances of each particular case," especially (1) "the severity of the crime at issue"; (2) whether the arrestee poses an immediate threat to the officer or passersby; and (3) whether the arrestee is "actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.  In any case, "the use of entirely gratuitous force is unreasonable and therefore excessive[.]" *Tracy*, 623 F.3d at 99 n.5.

It is true that defendants have argued and provided evidence that Lee continued to actively resist arrest throughout the officers' use of force. *See* Jones Aff. ¶¶ 29, 32-33; Perfetti Aff. ¶¶ 28-30, 32.  But Lee argues—with evidence in the form of his deposition testimony—that he had stopped resisting arrest by the time Jones and Perfetti kneed him on the ground. Lee Dep. 27, 35-38 (describing Lee asking officers to be easier with him and

relating officers being on top of Lee while he was on the ground when he was hit in back of head).

Viewing the evidence in the light most favorable to Lee—as the Court must in considering defendants' motion—a reasonable juror could credit Lee's testimony and determine that he was no longer resisting arrest at the time he was struck.  *Salvino*, 542 F.3d at 309 (noting court must draw all ambiguities in non-movant's favor).  The necessary consequence of that determination would be a finding that Lee was restrained and compliant for much of the March 3 encounter.

By extension, that finding would render all force used in taking Lee to the ground and handcuffing him gratuitous and *per se* excessive.  *Tracy*, 623 F.3d at 99 n.5.  In other words, a reasonable juror could conclude that Ashe, Perfetti, Parker, and Jones used excessive force in arresting Lee in violation of his Fourth Amendment rights.  There is therefore a dispute of material fact as to when Lee stopped resisting arrest, and in terms of pure summary judgment motion practice defendants' motion must be denied.

However, defendants wield a second argument in their attempt to secure summary judgment against Lee's excessive force claims.  In addition to arguing that Lee has failed to present sufficient evidence of excessive force on the merits, defendants also argue that they are qualifiedly immune from suit for those claims.

At trial, it may be determined that they are.  However, it is still too early to make that call.  Assuming that a juror comes to the same conclusion outlined above and determines that Lee was restrained and compliant when he was taken down, struck, and kneed, qualified immunity would not attach to those facts.  It is beyond clearly established that even if a suspect initially resists arrest, gratuitous force after resistance has stopped and compliance has been secured is unreasonable.  *Lennox v. Miller*, 968 F.3d 150, 157 (2d Cir. 2020)

(noting that use of force against restrained arrestee who had previously resisted arrest is clearly established to be unreasonable).

As a consequence, no reasonable officers could disagree as to whether defendants' use of force was reasonable if Lee had stopped resisting arrest before that force was used. *Cugini*, 941 F.3d at 615.  Under those assumed facts, defendants' use of force would violate clearly-established law and thus not be entitled to qualified immunity.  Because a reasonable interpretation of the facts of this case could leave defendants unprotected by qualified immunity, summary judgment cannot be granted in their favor for Lee's excessive force claims based on the March 3 incident.  *Lennox*, 968 F.3d at 157 (affirming denial of summary judgment on basis of qualified immunity because reasonable jury could conclude defendant officer used significant force after plaintiff had ceased resisting arrest).

## 2.  <u>State Law Assault and Battery.</u>

The Court turns next to Lee's state law assault and battery claims stemming from the March 3 incident.  That analysis will look familiar, because "[e]xcept for § 1983's requirement that the tort be committed under color of state law, the elements for a claim of assault and battery against law enforcement officers under New York law and a claim of excessive force under § 1983 are the same."  *Boyler v. City of Lackawanna*, 287 F. Supp. 3d 308, 326 (W.D.N.Y. 2018) (internal citations and quotation marks omitted).  By extension, "[a] lawful arrest is not an assault or battery under New York law, provided the force used is reasonable."  *Figueroa v. Mazza*, 825 F.3d 89, 105 n.13 (2d Cir. 2016).

The Court's analysis in the preceding section makes the outcome of defendants' motion to dismiss Count I straightforward, if not inevitable.  The same standard applies to both claims, and the same dispute of fact that doomed defendants' motion on plaintiffs' excessive force claims in Count II similarly stops their motion short on Count I.  *See Boyler*,

20

287 F. Supp. 3d at 326.  A reasonable juror could conclude that Lee had stopped resisting arrest by the time the arresting officers used significant force against him, and so a jury must be empaneled to resolve the question of when Lee stopped resisting arrest and whether the officers' use of force was reasonable in any case.  Defendants' motion as to Count I must therefore be denied.

### 3.  Section 1983:  Unreasonable Search and Seizure

In addition to protecting citizens from the use of excessive force prior to conviction, the Fourth Amendment also prohibits "unreasonable searches and seizures."  U.S. CONST. amend. IV.  Plaintiffs claim that Lee's search and arrest during the March 3 incident were unreasonable, but defendants argue that claim is foreclosed by Lee's guilty plea to charges stemming from the same altercation.

In *Heck v. Humphrey*, the Supreme Court ruled that a plaintiff hoping to recover damages under § 1983 for an unconstitutional conviction or imprisonment "must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal . . ., or called into question by a federal court's issuance of a writ of habeas corpus[.]"  512 U.S. 477, 486-87 (1994).

In so doing, the *Heck* Court carved out "an implicit exception from § 1983's otherwise broad scope for actions that lie within the core of habeas corpus" relief.  *Wilkinson v. Dotson*, 544 U.S. 74, 79 (2005) (internal citations and quotation marks omitted).  Functionally, then, *Heck* precludes § 1983 plaintiffs from using that statute to collaterally attack a criminal conviction.  *Waller v. Smith*, 403 F. Supp. 3d 164, 169 (W.D.N.Y. 2019).

Of course, as is often the case with exceptions to rules intended toward breadth, subsequent courts have limited *Heck*'s scope.  One crucial limitation is that *Heck* only bars a plaintiff if success on his § 1983 claim "would *necessarily* result in the nullification of his

21

conviction or the shortening of his confinement." *McKithen v. Brown*, 481 F.3d 89, 101 (2d Cir. 2007). For example, a § 1983 claim challenging a search that would, if invalidated, merely increase the likelihood that a plaintiff would be able to overturn a conviction without commanding that the conviction be overturned is still viable notwithstanding *Heck*. *Id.* at 102.

Additionally, this Circuit recognizes a second exception that *Heck* cannot bar a claim if habeas corpus remedies are not available. *See Jenkins v. Haubert*, 179 F.3d 19, 27 (2d Cir. 1999) (holding that some federal remedy "must be available" and if habeas corpus is not, § 1983 must be); *Leather v. Eyck*, 180 F.3d 420, 424 (2d Cir. 1999) (same).

As defendants correctly argue, to whatever extent Lee maintains an unreasonable search and seizure claim for the March 3 incident,[8] that claim is *Heck*-barred. If Lee succeeds on his unreasonable search and seizure claim, the necessary implication would be that the search and arrest which produced the marijuana, Hydrocodone/acetaminophen, and cocaine was unlawful. *See* Ashe Aff. ¶¶ 32-34. If that search were unlawful, those drugs would have been inadmissible as evidence in Lee's subsequent criminal proceedings. In the absence of any evidence of Lee actually possessing drugs on the night of March 3, his conviction for criminal possession of a controlled substance based on those events becomes more or less impossible to justify.

Similarly, if Lee's arrest on the night of March 3 were unlawful, then the fruits of that arrest—once again, the drugs on his person that night—would have been obtained unlawfully. *Heck* also prohibits the Court from reaching that determination in a § 1983 claim. *See, e.g.*, *Covington v. City of New York*, 171 F.3d 117, 123 (2d Cir. 1999) ("In a case where the *only* evidence for conviction was obtained pursuant to an arrest, recovery in a civil case

---

[8] Lee makes no effort to defend any such claim in his cross-motion. Because plaintiffs are counseled, the Court may "infer from [their] partial opposition that relevant claims . . . that are not defended have been abandoned." *Jackson v. Fed. Express*, 766 F.3d 189, 198 (2d Cir. 2014). The Court will nevertheless assess this claim's merit.

based on false arrest would necessarily impugn any conviction resulting from use of that evidence.").

In brief, then, a finding in this Court that Lee's arrest and its resulting search were unreasonable would necessarily require that his conviction be reversed. *McKithen*, 481 F.3d at 101. Therefore, Lee's illegal search and seizure claim for the March 3 incident is barred by *Heck* unless he can prove that conviction was successfully challenged through some more appropriate mechanism. But Lee has not provided any record evidence that his conviction has since been undermined, let alone reversed. *Heck*, 512 U.S. at 486-87; *see* DSMF ¶ 55 (noting that Lee never perfected appeal of guilty plea).

Finally, Lee cannot contend that habeas corpus was not available to him, because his sentence to three years' probation places him "in custody" for the purposes of habeas corpus. *See* 28 U.S.C. § 2254 (permitting district court to entertain writ of habeas corpus for "a person in custody pursuant to the judgment of a State court"); *Earley v. Murray*, 451 F.3d 71, 75 (2d Cir. 2006) ("Post-release supervision, admitting of the possibility of revocation and additional jail time, is considered to be 'custody.'"). Accordingly, habeas corpus was available to Lee. Because he had access to that mechanism to challenge the legality of his search and seizure on the night of March 3, § 1983 is closed to him. To whatever extent plaintiffs seek to maintain an illegal search and seizure claim for Count II, that claim must therefore be dismissed.

### B. Plaintiffs' April 24, 2018 Claims.

Both plaintiffs assert four claims arising from the April 24 incident: (1) unreasonable search and seizure in violation of the Fourth Amendment under § 1983; (2) excessive force in violation of the Fourth Amendment under § 1983; (3) assault and battery under New York common law; and (4) retaliation for protected speech in violation of the First Amendment

under § 1983.  Defendants have moved for summary judgment in their favor on each and all of these claims.  Plaintiffs have also moved for summary judgment in their favor on their unreasonable search and seizure claims.

**1.  Section 1983:  Unreasonable Search and Seizure.**

"The temporary detention of a person when the police have stopped h[is] vehicle, regardless of its brevity or limited intrusiveness, constitutes a seizure for Fourth Amendment purposes, and thus must not be unreasonable."  *Gilles v. Repicky*, 511 F.3d 239, 244-45 (2d Cir. 2007) (citing *Whren v. United States*, 517 U.S. 806, 809-10 (1996)).

A temporary detention amounts to a seizure within the meaning of the Fourth Amendment if "by means of physical force or show of authority" a police officer detains a plaintiff to the extent that "a reasonable person would have believed that he was not free to leave[.]"  *Brown v. City of Oneonta*, 221 F.3d 329, 340 (2d Cir. 2000).  For a seizure in the form of an investigatory stop to be reasonable, it must "be temporary and last no longer than is necessary to effectuate the purpose of the stop."  *Florida v. Royer*, 460 U.S. 491, 500 (1983).  Additionally, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time."  *Id.*

Of course, implicit in a requirement that police efficiently grapple with their suspicion is that suspicion existed in the first place.  To that end, the Supreme Court has clarified that the Fourth Amendment is not disturbed by a brief investigatory stop if the officers have reasonable suspicion, but not necessarily full probable cause, that a person may be armed and dangerous.  *Terry v. Ohio*, 392 U.S. 1, 24-27 (1968).

Police officers have reasonable suspicion to justify an investigatory stop if there is "a reasonable basis to think that the person to be detained is committing or has committed a

24

criminal offense." *United States v. Singletary*, 798 F.3d 55, 59 (2d Cir. 2015) (internal citations and quotation marks omitted).  As language like "a reasonable basis" suggests, reasonable suspicion is not a high standard to meet.  *Id.* at 59-60.  Even so, police need to be able to point to more than a hunch.  *Id.* at 59.  Rather, a stop is only justified if the police can point to "facts sufficient to give rise to a reasonable suspicion that criminal activity *may* be afoot."  *Id.* at 60 (emphasis in original) (internal citations and quotation marks omitted).

"[C]onduct that is as consistent with innocence as with guilt may form the basis for an investigative stop where there is some indication of possible illicit activity."  *United States v. Padilla*, 548 F.3d 179, 187 (2d Cir. 2008).  Courts use "commonsense judgments and inferences about human behavior" to parse out whether the conduct investigators observed sufficiently suggested illicit activity.  *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000).  Those commonsense judgments consider "the totality of the circumstances through the eyes of a reasonable and cautious police officer on the scene, whose insights are necessarily guided by his experience and training."  *Singletary*, 798 F.3d at 60.

There can be little doubt that plaintiffs were seized within the meaning of the Fourth Amendment during the April 24 incident.  Plaintiffs were confronted by multiple officers with weapons drawn, ordered out of their vehicle, and handcuffed.  DSMF ¶ 68; Lee Dep. 78.  The Second Circuit has identified each of these as factors indicating that a plaintiff was seized. *See, e.g.*, *Brown*, 221 F.3d at 340 (listing factors of seizure including presence of multiple officers, drawn weapons, physical touching of plaintiff, and tone indicating compliance was compulsory).

By extension, the only possible question of disputed fact is whether defendants' pair of anonymous tips and observations about plaintiffs provided the officers on the scene with

reasonable suspicion that plaintiffs were committing a crime.  Both parties contend that the question of reasonable suspicion can be answered on summary judgment.

Getting to the heart of that dispute first requires the Court to consider whether the information defendants relied on possessed sufficient indicia of reliability.  *United States v. Elmore*, 482 F.3d 172, 179 (2d Cir. 2007) ("Reasonable suspicion may be based upon information from a confidential informant so long as the tip bears sufficient 'indicia of reliability.'") (citing *Adams v. Williams*, 407 U.S. 143, 147 (1972)).  The indicia of reliability test considers the totality of the circumstances.  *See Alabama v. White*, 496 U.S. 325, 328-29 (1990) (holding that indicia of reliability test applicable to probable cause applies to reasonable suspicion inquiry but with less demanding standard).  Among the relevant circumstances subject to review are an informant's veracity, reliability, and basis of knowledge.  *Id.* at 328.

A truly anonymous tip by phone is often lacking in all three categories.  *See Florida v. J.L.*, 529 U.S. 266, 270-74 (2000) (finding unsupported anonymous tip from phone call lacked sufficient indicia of reliability to create reasonable suspicion).  Further, the Supreme Court has rejected arguments that:  (1) "a description of a particular person at a particular location illegally carrying a concealed firearm"; (2) prompt verification of all details of the tip except for the existence of the firearm; and/or (3) a lack of any specific reason to doubt the tip's reliability, can allow for reasonable suspicion.  *Id.* at 271.

Nevertheless, several circuit courts, including the Second Circuit, have held that "an anonymous 911 call reporting an ongoing emergency is entitled to a higher degree of reliability and requires a lesser showing of corroboration than a tip that alleges general criminality."  *United States v. Simmons*, 560 F.3d 98, 105 (2d Cir. 2009).  Additionally, a face-to-face informant must "be thought more reliable than an anonymous telephone tipster,

[because] the former runs the greater risk that he may be held accountable if his information proves false." *United States v. Salazar*, 945 F.2d 47, 50-51 (2d Cir. 1991).

Even if a tip is lacking in indicia of reliability on its own, police may nudge the inquiry toward reliability if they corroborate some of the tip's details. *See United States v. Bold*, 19 F.3d 99, 102 (2d Cir. 1994) (citing *White*, 496 U.S. at 328-29). Even corroborating more innocent elements of the tip may serve to support the tipster's overall reliability. *United States v. Walker*, 7 F.3d 26, 31 (2d Cir. 1993).

Plaintiffs first argue that the tips defendants relied on lacked sufficient indicia of reliability. That argument must be rejected. Without a doubt, a single anonymous 911 call under these circumstances would have had a much harder time amounting to reasonable suspicion. Even James' in-person tip, while certainly more reliable than the anonymous one, would perhaps not have clearly answered reasonable suspicion on its own. But although plaintiffs take a metaphorical sledgehammer to the reliability of either tipster standing alone, plaintiffs have little to say about how the two tips work in concert.

Nor is there much for plaintiffs to work with. The weight of two independent reports of the same criminal conduct in the same area is difficult to shrug off. Both tipsters claimed that two males with a gun were driving around downtown Troy after robbing someone. DSMF ¶¶ 61-62. Given the similarity of these two tips, no reasonable juror could conclude that defendants lacked reasonable suspicion that a crime was afoot on April 24.[9]

Of course, even if the two tips together are sufficiently reliable to support reasonable suspicion that a crime was being committed, that does not answer plaintiffs' argument that

---

[9] To whatever extent it is unclear which officers knew that there were two tips, that question is irrelevant. Under the collective or imputed knowledge doctrine, "an arrest or search is permissible where the actual arresting or searching officer lacks the specific information to form the basis for probable cause or reasonable suspicion but sufficient information to justify the arrest or search was known by other law enforcement officials initiating or involved with the investigation." *United States v. Colon*, 250 F.3d 130, 135 (2d Cir. 2001). As a consequence, every officer investigating the April 24 incident is imputed to have knowledge of both the substance and existence of the two tips.

defendants lacked reasonable suspicion that plaintiffs were the ones committing it.  To plaintiffs' point, "a description of race and gender alone will rarely provide reasonable suspicion justifying a police search or seizure." *Brown*, 221 F.3d at 334.

To hear plaintiffs tell it, the only distinguishing characteristics supporting the stop were that plaintiffs were two African American men in a car.  As a result, plaintiffs posit that defendants could not possibly have had reasonable suspicion to stop them.  But plaintiffs' argument goes too far.  In fact, there were several more details at the officers' disposal.

First, plaintiffs argue that their car was silver and therefore did not match the tipsters' description of a gray car.  Given the similarity of those two colors, that argument would be strained enough on its own, but plaintiffs themselves use the terms "gray" and "silver" interchangeably in describing the car.  *Compare* Kornegay Dep. 20 (describing car as silver), *with* Lee Dep. 74 (describing car as gray).  In that light, any apparent discrepancy between the color of the car the tipster described and the color of the car plaintiffs were actually in cashes out to a semantic distinction, not a factual one.  By extension, the police saw two African American males in a gray or silver car, which matches the informants' tips.

Second, the informants both noted that the alleged robbers were in the area of Ida Street.  DSMF ¶¶ 61-62.  Just as the tips described, the investigating officers observed plaintiffs' gray or silver car near Ida Street.  *Id.* ¶ 63.  The close proximity of plaintiffs' vehicle to the tipsters' identified location is another important piece of the totality of the information defendants contend supported reasonable suspicion.  *See Bailey*, 743 F.3d at 332 (noting that reasonable suspicion inquiry considers totality of circumstances).

Third, however, plaintiffs correctly note that the 911 call described plaintiffs' car as a Toyota, when it was in fact a Nissan.  *Compare* DSMF ¶ 62 (tipster describing car as Toyota), *with* Kornegay Dep. 20 (Kornegay describing car as Nissan).  Plaintiffs are correct that this

discrepancy cuts against defendants' reasonable suspicion.  But it does not destroy it.  As the Second Circuit has noted, a minor discrepancy between a tip and the scene observed by the officers does not by itself invalidate reasonable suspicion.  *Dancy v. McGinely*, 843 F.3d 93, 109 (2d Cir. 2016).  In particular, it can often be difficult to tell the brand of a car from a distance, and a mistake by either the officers or the anonymous tipster as to that detail is not enough to end the reasonable suspicion inquiry in plaintiffs' favor.

All together, when defendants stopped plaintiffs' car, their articulable basis for the stop was that plaintiffs were two African American males in a silver or gray car in the immediate area of a crime identified by two tips by two distinct tipsters.  Although a far cry from the purely race-conscious stop plaintiffs identify, plaintiffs are correct that some courts outside of this Circuit have found somewhat similar facts to be insufficient to support reasonable suspicion.

For example, plaintiffs cite *United States v. Jones*, 998 F.2d 883, 885 (10th Cir. 1993).  In that case, the Tenth Circuit found reasonable suspicion lacking where police stopped two African American men in a black Mercedes based only on a report of a similar car carrying two African American men away from a nearby disturbance involving a firearm.  *Id.*

Yet there are two significant reasons that *Jones*'s shoe does not fit this case.  First, the Tenth Circuit specifically noted several reasons that the Mercedes the officers stopped in *Jones* was exceedingly unlikely to be the robbers' vehicle.  Specifically, the Tenth Circuit found reasonable suspicion lacking because the officers were aware that there was also a child in the car at the time they made the stop, and the report made no mention of a child being involved in the disturbance.  *Id.*  Additionally, the car was spotted pulling into a parking space at a grocery store which could only be reached from the scene of the disturbance by a circuitous route.  *Id.*  The car was also heading in the wrong direction to have come from the

disturbance.  *Id.*  Each of these facts severely undercut the investigating officers' ability to develop reasonable suspicion, and no similarly undermining facts appear on this record other than the discrepancy between plaintiffs' car being a Toyota or a Nissan.  DSMF ¶ 62; Kornegay Dep. 20

But the second distinction between this case and *Jones* is still more significant.  Unlike in *Jones*, in this case the investigating officers believed from the anonymous tipster that the culprits of the robbery were not only armed but were actively threatening to kill someone. DSMF ¶ 62.  At this point, plaintiffs might renew their objection to the reliability of the anonymous tipster, but it bears repeating that the close similarity between the anonymous caller's tip and James's provides strong additional credibility to even the anonymous tipsters' report.  In that light, the police justifiably credited the anonymous tip's invocation of an emergency.

Applying the filter of an active, life-threatening emergency recolors plaintiffs' stop from one closer to the gray area of legality to one safely within the Fourth Amendment's confines. According to the Second Circuit, the requirement that police corroborate the accuracy of a tip weakens when the police are aware of facts indicating that swift action is required to prevent violence.  *United States v. Simmons*, 560 F.3d 98, 107-108 (2d Cir. 2009).  The circumstances confronting the investigating officer comfortably fits *Simmons*' bill.  *Id.*  The officers arrived at a scene where a homicide was reportedly imminent and corroborated the innocent details of the tips that there would be two African American men in a gray or silver car in the area.  This corroboration was enough to afford the investigating officers reasonable suspicion to stop plaintiffs as a matter of law.[10]

---

[10] Although plaintiffs do not raise the issue, it bears mentioning that plaintiffs' being handcuffed did not convert the stop into an arrest requiring full probable cause.  Although handcuffing a suspect during a *Terry* stop often ripens that stop to an arrest, officers may nevertheless handcuff a suspect during the course of a stop if handcuffing is "a reasonable response to legitimate safety concerns on the part of the investigating officers."

Similarly, defendants did not hold plaintiffs any longer than was necessary to confirm that, if there ever was truly a robbery and threatened homicide on April 24, 2018, plaintiffs were not the culprits.  At most, plaintiffs estimate that their interactions with police lasted about twenty minutes.  DSMF ¶ 75.  During that time, the officers on the scene searched plaintiffs' car and questioned them as to the potential robbery.  *Id.* ¶¶ 70, 74; Kornegay Dep. 28.  Once that search and questioning concluded, plaintiffs were allowed on their way.  DSMF ¶ 75.  In the shadow of the investigating officers' active belief that potential violence was imminent, they acted proportionately to those concerns and their reasonable suspicion.

In summary, Troy police officers had reasonable suspicion to stop plaintiffs on April 24, 2018 as a matter of law.  The officers had a pair of reports of ongoing criminal activity featuring a threat of imminent violence.  Those reports described a similar scene to the one the investigating officers found when they observed plaintiffs in their car.  The officers stopped plaintiffs, handcuffed them long enough to search their vehicle, and then released them.

Those facts are undisputed, and considering the totality of the circumstances they present, no reasonable juror could conclude that plaintiffs' Fourth Amendment protections against unlawful searches and seizures were violated during the April 24 incident.  Those claims must therefore be dismissed.  *See, e.g.*, *Grice v. McVeigh*, 873 F.3d 162, 168 (2d Cir. 2017) (dismissing complaint against officer who stopped and handcuffed plaintiff for thirty-three minutes based on report of person matching plaintiff's description bending down with remote device intending to sabotage railroad because officer had reasonable suspicion plaintiff was dangerous).

---

*United States v. Vargas*, 369 F.3d 98, 102 (2d Cir. 2004).  In this case, the investigating officers had credible reports that the suspects they were investigating were armed, dangerous, and potentially about to commit a murder.  The officers justifiably determined that for their own safety, plaintiffs should be cuffed until they assessed whether plaintiffs posed a threat.

### 2. __Section 1983:  Excessive Force.__

Defendants also seem to argue that plaintiffs' excessive force claims arising from the April 24, 2018 incident are unsupported by the evidence.  The only force the record alludes to the police using on that day was their handcuffing plaintiffs.[11]

In reviewing the reasonableness of an officer's decision to handcuff during an arrest or stop, the Second Circuit instructed in *Cugini* that courts consider "whether an officer reasonably should have known during handcuffing that his use of force was excessive." 941 F.3d at 613.  "A plaintiff satisfies this requirement if either the unreasonableness of the force used was apparent under the circumstances, or the plaintiff signaled h[is] distress, verbally or otherwise, such that a reasonable officer would have been aware of h[is] pain, or both."  *Id.*

In handing down that ruling, the Second Circuit seemingly approved three factors used by lower courts to assess the reasonableness of a police officer's use of handcuffs: (1) whether the handcuffs were unreasonably tight; (2) the defendants' ignoring the arrestee's pleas that the handcuffs were too tight; and (3) the degree of injury to the arrestee's wrists. *Esmont v. City of New York*, 371 F. Supp. 2d 202, 215 (E.D.N.Y. 2005).  Of course, after *Cugini*, those factors are only useful to help contextualize the Circuit's controlling reasonableness test.  *See* 941 F.3d at 612-13.

Nowhere do plaintiffs argue that they communicated any distress from being handcuffed at any point to any officer during the April 24 stop.  Thus, defendants are entitled to summary judgment on plaintiffs' excessive force claims if they can prove that there is no

---

[11] To whatever extent plaintiffs may argue that the officers' approaching them with guns drawn constituted excessive force, this Court joins several others in the Second Circuit in holding that "merely drawing weapons when effectuating an arrest does not constitute excessive force as a matter of law."  *Podlach v. Vill. of Southampton*, 2017 WL 4350433, at *3 (E.D.N.Y. May 11, 2017) (collecting cases).

question of fact as to whether the force the officers used was reasonable under the circumstances. *Cugini*, 941 F.3d at 613.

Defendants have met that burden. Plaintiffs' only argument is that it was unnecessary to handcuff them and place them in squad cars during the duration of the search of their vehicle. But even viewing the facts in the light most favorable to plaintiffs, it is impossible to imagine a factfinder concluding that it was unreasonable for police to handcuff men that they believed, based on two separate reports, were armed, had just committed a robbery, and potentially were preparing to kill someone. DSMF ¶¶ 61-62.

Plaintiffs have admitted that those pieces of information had reached Troy police both through a confidential informant and through James, who approached some officers in person. DSMF ¶¶ 61-62. Plaintiffs' argument that the police should have simply left them unrestrained before even confirming whether they were actively armed or dangerous cannot carry enough water to convince a reasonable juror that defendants' handcuffing plaintiffs was unreasonable.

Plaintiffs still try to preserve these claims by arguing that, if a reasonable jury could have concluded that defendants lacked reasonable suspicion to enact the traffic stop in the first place, any use of force at all would have been unreasonable. *See Mejia v. City of New York*, 119 F. Supp. 2d 232, 282 (E.D.N.Y. 2000) ("[W]here arresting officers do not even have an objectively reasonable belief that probable cause exists . . . any use of force would be objectively unreasonable under the circumstances.") (citation omitted).

Even setting aside the Court's ruling that no reasonable juror could come to that conclusion in the previous section, plaintiffs' argument is still meritless. Contrary to plaintiffs' arguments, under controlling Second Circuit caselaw there is no *per se* rule that a lack of suspicion means any force at all is excessive. *See Jones v. Parmley*, 465 F.3d 46, 62

33

(2d Cir. 2006) ("[T]he reasonableness test . . . remains the applicable test for determining when excessive force has been used, including those cases where officers allegedly lack probable cause to arrest.").  Plaintiffs must therefore prove that defendants' act of handcuffing plaintiffs was unreasonable under the circumstances defendants faced.

Because no reasonable juror could conclude that handcuffing plaintiffs while the investigating officers ensured they were not armed and dangerous was excessive, plaintiffs' excessive force claims for the April 24 incident must be dismissed.  *See, e.g.*, *Williams v. City of New York*, 2019 WL 11318049, at *7 (E.D.N.Y. May 30, 2019) (dismissing excessive force claim where plaintiff was handcuffed during fruitless search for weapons because use of force was reasonable).  Therefore, all of plaintiffs' claims under Counts IV and VII must be dismissed.

### 3.  <u>State Law Assault and Battery.</u>

For the same reasons discussed above for plaintiffs' excessive force claims under § 1983, plaintiffs' state law assault and battery claims under Counts III and VI must also be dismissed.  *See Boyler*, 287 F. Supp. 3d at 326 (noting that reasonableness analysis for state law assault and battery claims by arresting officer are same as for § 1983 claims).

### 4.  <u>Section 1983:  Retaliation.</u>

Finally, the Court turns to plaintiffs' retaliation claims.  "To plead a First Amendment retaliation claim a plaintiff must show:  (1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by his exercise of that right; and (3) the defendant's actions caused him some injury."  *Dorsett v. Cty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013).  "[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers."  *City of Houston v. Hill*, 482 U.S. 451, 461 (1987).

For fairly obvious reasons, plaintiffs do not defend their retaliation claims in their cross-motion and opposition.  There can be no doubt that Lee has a First Amendment right to criticize Ashe, Jones, Parker, and Perfetti for their use of force during the March 3 incident.  *Hill*, 482 U.S. at 461.  However, plaintiffs still bear the burden of proving at trial that defendants' actions were motivated or caused by plaintiffs' exercise of that right.  That obstacle proves too much for plaintiffs to clear.

Nowhere in the complaint or the record do plaintiffs suggest that they ever actually exercised any First Amendment right that caused defendants to retaliate against them.  In fact, there is no evidence before the Court that Kornegay ever spoke to a police officer at all prior to the April 24 incident, let alone engaged in a protected First Amendment criticism.

The closest plaintiffs come to identifying speech protected by the First Amendment is Lee requesting a complaint form about the March 3 incident.  Lee Dep. 90.  Of course, if Lee had followed through and submitted a complaint form, the question would become much more complicated, and its answer much more likely to be favorable to plaintiffs.  But he admits that he never actually filed the complaint.  *Id.*; DSMF ¶ 58.  In the absence of Lee actually speaking, his First Amendment complaint loses its substance.

Because neither plaintiff has presented any evidence that they ever engaged in protected speech that could have caused defendants to retaliate against them, Counts V and VIII must be dismissed.  *Lilly v. Town of Lewiston*, 449 F. Supp. 3d 190, 196, 202-03 (W.D.N.Y. 2020) (dismissing First Amendment retaliation claim for ten-to-fifteen minute traffic stop where plaintiff failed to identify protected speech).

## V.   **CONCLUSION**

The Court understands plaintiffs' skepticism concerning the April 24 incident.  Only a month and a half month earlier, Lee had a dramatic altercation with police which could

reasonably have involved their use of excessive force against him.  That a car he and his grandson occupied got stopped by the same police department so soon afterwards would justifiably trigger some concerns that Lee was being singled out.  Even so, at the close of discovery, plaintiffs managed to uncover no evidence that the April 24 incident was anything more than a legitimate emergency stop involving plaintiffs only by coincidence.  All claims concerning that incident must therefore be dismissed.

But the March 3 incident is different.  Reasonable minds could differ as to what happened on that night.  Perhaps Lee was dangerously resisting arrest and all force used was necessary to earn his compliance.  Perhaps the officers used more force than the circumstances called for.  In either case, that question cannot be answered by this Court, but only by a jury.  The parties must therefore proceed to trial on Counts I and II.

Therefore, it is

ORDERED THAT

1. Defendants' Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART;

2. Plaintiffs' Cross-Motion for Summary Judgment is DENIED;

3. Counts:  (III) assault and battery under the New York Common Law by plaintiff Lamont Lee for the April 24 incident; (IV) excessive force and unreasonable search and seizure in violation of the Fourth Amendment under 42 U.S.C. § 1983 by plaintiff Lamont Lee for the April 24 incident; (V) retaliation in violation of the First Amendment under 42 U.S.C. § 1983 by plaintiff Lamont Lee for the April 24 incident; (VI) assault and battery under the New York common law by plaintiff Tymel Kornegay for the April 24 incident; (VII) excessive force and unreasonable search and seizure in violation of the Fourth Amendment under 42 U.S.C. § 1983

36

by plaintiff Tymel Kornegay for the April 24 incident; and (VIII) retaliation in violation of the First Amendment under 42 U.S.C. § 1983 by plaintiff Tymel Kornegay for the April 24 incident are DISMISSED;

4. Plaintiff Lamont Lee's Count II claim for unreasonable search and seizure in violation of the Fourth Amendment under 42 U.S.C. § 1983 for the March 3 incident is DISMISSED;

5. Plaintiff Tymel Kornegay is DISMISSED;

6. Defendants patrolman "John" Morris and sergeant "John" Barker are DISMISSED;

7. Defendants' motion for summary judgment against plaintiff Lamont Lee's claims for the March 3 incident under counts:  (I) assault and battery under the New York common law; and (II) excessive force in violation of the Fourth Amendment under 42 U.S.C. § 1983 is DENIED.

IT IS SO ORDERED.

Dated:  February 16, 2021
         Utica, New York.

David N. Hurd
U.S. District Judge