UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
LAMONT LEE,

                Plaintiff,

    -v-                            1:19-CV-473

THE CITY OF TROY; PATROLMAN
CHRISTOPHER PARKER;
PATROLMAN LOUIS PERFETTI;
PATROLMAN JUSTIN ASHE; and
PATROLMAN KYLE JONES,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:             OF COUNSEL:

SIVIN, MILLER & ROCHE LLP    DAVID ROCHE, ESQ.
Attorneys for Plaintiff           EDWARD SIVIN, ESQ.
20 Vesey Street Suite 1400    CLYDE RASTETTER, ESQ.
New York, New York 10007     GLENN D. MILLER, ESQ.

PATTISON, SAMPSON LAW FIRM  MICHAEL E. GINSBERG, ESQ.
Attorneys for Defendants        RHIANNON INEVA
22 First Street                   SPENCER, ESQ.
P.O. Box 208
Troy, New York 12181

OFFICE OF RICHARD T. MORRISSEY  RICHARD T. MORRISSEY, ESQ.
Attorneys for Defendants
64 Second Street
Troy, New York 12180

DAVID N. HURD
United States District Judge

## MEMORANDUM-DECISION and ORDER

## TABLE OF CONTENTS

I. INTRODUCTION..................................................................................2

II. BACKGROUND................................................................................4

   A. The Two Versions...........................................................................5

   B. Pre-Trial Disclosures.....................................................................9

   C. Course of Trial.............................................................................14

   D. The Present Motion Practice........................................................27

III. LEGAL STANDARD......................................................................27

   A. Rule 50 Motion for Judgment as a Matter of Law............................27

   B. Rule 59 Motion for a New Trial......................................................28

IV. DISCUSSION................................................................................29

   A. Plaintiff's Motion for Judgment as a Matter of Law..........................30

   B. Plaintiff's Motion for a New Trial...................................................33

     1. Weight of the Credible Evidence..................................................33

     2. Conduct of Defense Counsel.......................................................37

       a.  Comment Concerning European Justice System.........................39

       b.  Comment Concerning "Home Run" in Northern District..............40

       c.  Provenance of Plaintiff's Exhibit 12.......................................41

       d.  Prejudicial Effect of Improper Comments................................50

V. CONCLUSION................................................................................60

## I.  INTRODUCTION

    A trial can be a chaotic affair, and it falls to the presiding court to keep

that chaotic potential as muted as possible.  The court's responsibility is to

conduct a days-long (at least) event involving (at least) two parties with

diametrically opposed interests as they present a parade of witnesses and other evidence.  In the process, the court needs to ensure that the parties and witnesses adhere to a complex system of rules and guidelines concerning the admissibility of evidence and the propriety of conduct.

When the parties and the Court are fully and properly prepared, the result is something of a symphony.  From several disparate—and even occasionally contrary—voices a harmonious whole emerges for the jury to absorb.  Take that preparation away and you get a dysphonic mess.  This case is an abject lesson in how to avoid the latter outcome.  Its moral?  The importance of keeping the court informed, especially when it comes to allegations of sanctionable misconduct concerning the most important evidence in the case.

The story played out from May 10 through May 12, 2021.  During those three days, a jury trial was held concerning plaintiff Lamont Lee ("Lee" or "plaintiff")'s claim that defendants the City of Troy and its police officers Christopher Parker, Louis Perfetti, Justin Ashe, and Kyle Jones (collectively "defendants") used excessive force in arresting him on the night of March 3, 2018.

The entire arrest was captured on video, and the Court expected that video to be the trial's centerpiece.  What the Court had no reason to expect, however, was that each party intended to present its own version of the video.  Nor did the Court expect that defendants would accuse plaintiff of

improperly altering his version.  Instead, the Court learned both details for the first time about half an hour before trial began.  The validity of each version of the video thus became a central dispute as the evidence came in.

At the close of trial, the jury found no cause of action against defendants. Judgment was entered accordingly, and Lee's complaint was dismissed.  On June 9, 2021, plaintiff moved for judgment as a matter of law notwithstanding the jury verdict or in the alternative for a new trial under Federal Rule of Civil Procedure ("Rule") 50(b) and Rule 59(a)(1)(A), respectively.  In part, those motions complain that the Court erred in its handling of defendants' arguments that their version of the video was the "official" one and that plaintiff's was "manufactured."  Those motions, having been fully briefed, will now be decided on the basis of the submissions and without oral argument.

## II.  <u>BACKGROUND</u>

Understanding how the trial in this case unfolded first requires understanding how the Court found itself with two competing versions of the same video at the last minute.  Lee's arrest and the force defendants used to bring it about were both captured from beginning to end on a security camera belonging to a nearby barbershop.  As is often the case, the video's existence served a streamlining function by circumscribing the universe of facts the

4

parties could genuinely dispute.  But when a second version emerged, the

disputes in this case took on an entirely different and unexpected dimension.

### A. **The Two Versions**

As has been mentioned, there are two main versions of the video depicting

Lee's arrest.  However, the presentation of those versions gets complicated:

defendants' version is split into two parts, while plaintiff's is split into three.

Between the five clips resulting from those splits and two additional clips

plaintiff proposed in advance of trial but did not end up using, there are

seven total video clips the Court has reviewed in deciding plaintiff's present

motion: (1) plaintiff's first proposed version ("C-1(A)"), submitted on April 23,

2021, which merely combined defendants' two clips into one; (2) plaintiff's

abbreviated cut of his own version of the video, provided on April 29, 2021

("C-1(B)"); (3) defendants' first video, which covers the first half of the March

3, 2018 encounter ("D-8"); (4) defendants' second video, which covers the

second half of the arrest ("D-9"); (5) plaintiff's first video shown at trial,

covering the drug transaction ("P-12(A)"); (6) plaintiff's second trial video,

showing plaintiff's arrest ("P-12(B)"); and (7) plaintiff's third and final trial

video, which shows the aftermath of plaintiff's arrest ("P-12(C)").

To provide context for the relevant facts of this case, the Court will cabin

itself for the moment to the two versions of the video the jury was shown:

P-12 and D-8/D-9.  In both of those versions, Lee approaches a pair of people

talking outside of a bar at 9:45 p.m. on March 3, 2018.  Dkt. 91-6 ("P-12"),
P-12(A), 9:45:10;[1]  Dkt. 90-3, Part One of Exhibit C-2 to the Declaration of
Rhiannon Spencer dated 6/3/2021 ("D-8"), 9:45:10.  Both parties agree that
this conversation builds to a hand-to-hand drug transaction at approximately
9:52 p.m.  P-12(A), 9:51:00-52:40; D-8, 9:51:00-52:40.  Four police officers,
defendants,[2] then quickly converge on plaintiff and the other party to the
drug deal.  P-12(B), 9:52:40-55; D-8, 9:52:40-55.  One defendant directs
plaintiff up against a wall.  P-12(B), 9:52:49; D-8, 9:52:49.

The videos then show Lee's left hand drifting slowly toward his front left
pocket.  P-12(B), 9:52:54; D-8, 9:52:54.  In response, three of the officers
restrain plaintiff, and attempt to bring him to the ground by striking his legs
with their knees.  P-12(B), 9:52:54-53:07; D-8, 9:52:54-53:07.  Plaintiff
manages to stay upright, even when the fourth defendant approaches him
from behind, grabs him, and attempts to drag him down.  P-12(B), 9:53:07-12;
D-8, 9:53:07-12.  The four defendants then attempt to secure plaintiff's hands.
P-12(B), 9:53:12-48; D-8, 9:53:12-48.  The parties continue to struggle until

---

[1] All versions of the video contain a timestamp tracking when the video was captured in real
time.  The parties both use this timestamp to refer to specific portions of the video.  The Court will do
the same.

[2] Plaintiff's claims against the City of Troy were derivative of his claims against the four
individual defendants.  References to "defendants" as physical actors refer only to the individual
defendants.

the videos show plaintiff spinning away from defendants, breaking their holds on him.  P-12(B), 9:53:48-56; D-8, 9:53:48-56.

Both versions of the video then show defendants regaining control over Lee's body and dragging him to the ground.  P-12(B), 9:53:56-54:00; D-8, 9:53:56-54:00.  Defendants then slowly flatten plaintiff out, until one of the defendants manages to pin plaintiff's right arm to the ground under the defendant's knee.  P-12(B), 9:54:00-14; D-8, 9:54:00-14.  Another defendant then strikes plaintiff with his knee somewhere in his torso or legs, although the videos are far from clear about where the blows land.  P-12(B), 9:54:14-19; D-8, 9:54:14-19.  Both videos show all four defendants continuing to struggle with plaintiff, until one of the defendants—later identified as Kyle Jones ("Jones")—strikes plaintiff repeatedly with his hand or fist.  P-12(B), 9:54:25-30; D-8, 9:54:25-30.

Here at last the two versions of the video diverge.  In D-8, defendants' version of the video, Jones is kneeling on his left knee with his right leg extended to the side, his back to the camera, directly in front of Lee's head and shoulders.  D-8, 9:54:30.  The hat plaintiff had been wearing is lying on the ground near Jones's right knee.  *Id.*  Jones begins to rise.  *Id.*  The footage for D-8 abruptly ends the instant the timestamp changes from 9:54:30 to 9:54:31.  *Id.* at 9:54:30-31.

At the beginning of D-9, defendants' second clip, the timestamp immediately changes from 9:54:31 to 9:54:32.  Dkt. 90-3, Part Two of Exhibit C-2 to the Declaration of Rhiannon Spencer dated 6/3/2021 ("D-9"), 9:54:31-32.  Jones is still rising, but Lee's hat has moved at least a foot to the right, and appears to be rolling from side to side.  *Id.*  Jones braces himself, then drops his knee on plaintiff twice from above.  *Id.* at 9:54:32-36.  It is less than perfectly clear where or whether either of the knee strikes lands.  *Id.* But the second knee strike is particularly difficult to follow because of the positioning of Jones' body.  *Id.*

Meanwhile, Lee's version of the video for the same timeframe shows Jones kneeling on his left knee with his right leg extended to the side, his back to the camera, directly in front of plaintiff's head and shoulders.  P-12(B), 9:54:30.  The hat plaintiff had been wearing is lying on the ground near Jones's right knee.  *Id.*  Jones begins to rise.  *Id.*  Once Jones reaches the apex of his motion, he brings his right knee down on plaintiff.  *Id.* at 9:54:31-32.  Jones's right foot catches plaintiff's hat as his knee descends, knocking it at least a foot to the right, where it comes to a rest after rolling briefly from side to side.  *Id.*  Jones begins to rise again.  *Id.*  Once Jones comes fully up, he braces himself, then drops his knee on plaintiff twice more from above.  *Id.* at 9:54:32-36.

The remainder of P-12(B-C) is substantively identical to D-9. Both videos then show defendants placing Lee in handcuffs and removing him from the scene. P-12(B), 9:54:36-56:59; P-12(C), 9:56:46-10:01:03;[3] D-9, 9:54:36-10:01:03. In summary, the only substantive difference between the two is that in plaintiff's version of the video, Jones uses three knee strikes, while in defendants' version Jones uses only two, with a brief moment prior to those knee strikes missing from defendants' video. Dkt. 91-4, p. 116[4] (defendant acknowledging that small amount of time is missing from defendants' version of video).

**B. Pre-Trial Disclosures**

If the slight difference between the two versions of the video seems innocuous, the parties at least thought it was worth sparring over from the start. Apparently, though, they did not think the difference important enough to bring to the Court's attention.

On April 23, 2021, Lee's and defendants' counsel spoke privately over the phone in advance of trial. Dkt. 93 ("Spencer Aff."), ¶ 7. One of the topics the parties discussed was stipulating to certain exhibits. Dkt. 90-2, ¶ 4. Predictably, that included the video of plaintiff's arrest. *See id.*, ¶ 5.

---

[3] According to plaintiff, there is some slight overlap between the end of P-12(B) and the beginning of P-12(C) to demonstrate that nothing was omitted.

[4] Pagination Corresponds with CM/ECF.

Defense counsel had disclosed both D-8 and D-9 to Lee in the course of discovery.  Dkt. 90-2, ¶¶ 6, 8.  For the first time during the April 23, 2021 phone call, Lee's counsel[5] notified the defense that they intended to combine those two videos into a single, seamless clip, C-1(A).  *Id.* ¶¶ 5, 7.  Defense counsel agreed to review plaintiff's proposed version of the video but did not commit to stipulating to it until after they had a chance to review it.  *Id.* ¶ 8.

When defense counsel reviewed C-1(A), they noticed a "glitch" at the part of the video timestamped 9:54:30. Dkt. 90-2, ¶ 11.  The Court's independent review of C-1(A) for this motion practice picked up the same glitch. Dkt. 90-3, Part One of Exhibit C-1 to the Declaration of Rhiannon Spencer dated 6/3/2021 ("C-1(A)"), 9:54:30.  In practice, the glitch reflects a small section of missing video described above at the changeover from D-8 to D-9: the timestamp skips from the instant the clock ticks to 9:54:31 to the instant before it ticks to 9:54:32, omitting less than a second of video but enough to be noticeable to a careful observer.  *See id.* 9:54:29-33; Dkt. 91-4, p. 116 (defendant Justin Ashe acknowledging missing portion of time of "less than a second" between end of D-8 and beginning of D-9).

---

[5] One of plaintiff's attorneys for the present motion practice, Clyde Rastetter, Esq., had yet to be admitted to the bar before trial but was nevertheless heavily involved in trial preparation and the events concerning plaintiff's motion.  He has since been admitted.  For simplicity's sake, the Court will refer to both Mr. Rastetter and plaintiff's lead counsel as plaintiff's counsel throughout this Memorandum-Decision and Order.

Lee noticed the glitch as well.  According to plaintiff's counsel, in the leadup to trial, plaintiff himself alerted his attorneys that the version of the video his attorneys were intending to introduce was missing a portion. Dkt. 91-1 ("Roche Aff."), ¶ 9.  What is more, plaintiff claimed that another version in his possession from his criminal case included the missing footage.[6]  *Id.*

On April 29, 2021, eleven days before trial, Lee's counsel informed defense counsel that they would instead be introducing C-1(B), which they claimed was "the best and most complete version" of the video.  Dkt. 90-2, ¶ 12.  After reviewing C-1(B), the defense refused to stipulate to its use at trial, claiming foul play by plaintiff's counsel.  *Id.* ¶¶ 13-14.  They did not notify the Court of this dispute.

Defendants' allegations of evidence tampering came along two fronts.  The first set of allegations consisted of technical complaints.  Specifically, defendants complain that there is a different caption at the start of the two versions of the video plaintiff provided.  Dkt. 90-2, ¶ 13(c).  However, defendants also object that C-1(B), Lee's April 29, 2021 version of the video, has been slowed down.  Dkt. 90-2, ¶ 13(d).  On careful review, defendants are

---

[6] In plaintiff's discovery disclosures dated May 14, 2019, he informed defendants that he had his own video of the March 3, 2018 arrest.  Dkt. 33-5, p. 2.

correct that the two videos move at different speeds.  In fact, most versions of the video the Court has observed keep different time.

When compared to a stopwatch in real time, C-1(A), Lee's April 23, 2021 version of the video, runs roughly four seconds ahead of the stopwatch after a minute has lapsed in real time.  *See generally* C-1(A).  P-12(A) and (C), which are plaintiff's trial videos that cover the events before and after plaintiff's arrest, move at about the same speed as C-1(A).  *See generally* Dkt. 91-6 ("P-12"), (A), (C).

But C-1(B), plaintiff's video submitted on April 29, 2021, tracks squarely with the stopwatch, at least after a minute.  *See generally* C-1(B).  Curiously, the same is true of P-12(B), the middle portion of plaintiff's trial video, even though P-12(A) and (C) moved slightly faster than real time.  *See generally* P-12(B).  Meanwhile, D-8 and D-9, the two clips comprising defendants' version of the video played at trial, both run approximately forty seconds faster than a stopwatch after a minute, or roughly at 1.67 times real time. *See generally* D-8; D-9.

But in addition to these technical objections to Lee's version of the video, defendants also attack plaintiff's version along substantive lines.  To begin, defendants point out that C-1(B) was only 4:10 in length while C-1(A) had been 30:45 long.  Dkt. 90-2, ¶ 13(a).  As it turns out, C-1(B) had been shortened on either side.  *Id.* ¶ 13(b).  Plaintiff omitted both the conceded

12

drug transaction preceding his arrest and several minutes of police activity after it.  *See id.*

At trial, though, defendants' objection would largely prove to be moot. P-12 ran the full gamut of relevant events.  *See* Dkt. 90-2, ¶ 18 (noting that P-12(A) contained "Pre-Incident" footage, P-12(B) contained "Incident" footage, and P-12(C) contained "Post-Incident" footage).  With the exception of some police activity at the end of P-12(C), all three were played for the jury in full and admitted into evidence.  Dkt. 91-3, pp. 45-48.

But defendants' issues with C-1(B) are not exhausted yet, and the most serious comes last.  Namely, defendants contend that Lee's counsel manufactured evidence by artificially aggravating the events the video captured.  Dkt. 90-1, ¶ 14.  From defendants' perspective, plaintiff's counsel "added in" a third knee strike to the missing second to make Jones look more culpable than he truly was.  *Id.* (defense counsel remarking that plaintiff's version of video "had additional material added to it such as a third knee strike").

For each and all of these reasons, defendants refused to stipulate to Lee's version of the video.  Dkt. 90-3, ¶ 14.  But even though they were both aware of it some eleven days before trial, neither party brought this conflict to the Court's attention.  Instead, the Court first learned that there was no stipulation as to which version of the video would come in during a

13

conference on the morning of May 10, 2021, immediately before trial. *See* Spencer Aff. ¶ 8.

For the first time at that conference, defendants' counsel accused plaintiff of adding a third knee strike into their version. But according to plaintiff's counsel, the defendants' version had a gap during the most crucial portion of the encounter that formed the foundation of plaintiff's claims.

In context, accusations this severe require immediate investigation. But this Court was given no such context. In fact, the Court had seen neither version of the video in advance of trial.[7]  The Court thus had no idea of the enormity of the burgeoning dispute. Instead, the parties were each told to lay a foundation for their version of the video, and if both succeeded, the jury would see both versions. Under that direction from the Court, trial began.

### C. **Course of Trial**

Once a jury had been empaneled, trial proceeded as normal with opening statements. Lee's counsel gave a brief overview of the evidence. In doing so, he informed the jury that plaintiff had seen the video for the first time the day after he was released from jail. Dkt. 85, p. 9. According to plaintiff's

---

[7] The Court has already described its travails in viewing defendants' version of the video at the summary judgment stage. *Lee v. City of Troy*, 2021 WL 1318105, at *1-2 (N.D.N.Y. Apr. 8, 2021) (denying reconsideration because defendants failed to provide functional version of video). Instead, the only video the Court had seen before trial was an online version roughly equivalent to C-1(A). *Lamont Lee Arrested by Troy, NY Police (3-3-2018)*, YOUTUBE, https://www.youtube.com/watch?v=J-89ICc4plw (last visited August 30, 2021).

counsel, he personally went to the barbershop to see if any cameras had captured his arrest and watched the video for himself that day. *Id.* Plaintiff's attorneys then promised the jury they would see that video as well. *Id.*

Next, defendants' counsel took the podium and addressed the jury. Defendants immediately worked to shape the narrative surrounding the two disparate versions of the video. Early in their opening, defense counsel said "now, [Lee's] attorney wants to show you their video. *Their video is manufactured*. They made it. It's not the video that was taken into possession by the police from the storefront that it was captured from. They left out the drug deal . . . ." Dkt. 91-2, p. 5 (emphasis added).

Defendants' counsel would repeat that theme a second time in his opening, and more squarely this time. Defendants' counsel claimed that during Lee's arrest defendant "Jones delivers two knee strikes; not the three that [plaintiff has] in [his] manufactured video, because that's not on the original video." *Id.* at 11. Again, the Court's first instinct was to allow both versions in and to permit the jury to decide the validity of the videos for themselves, so there were no limiting instructions concerning the respective validity of the videos. Neither did plaintiff's counsel object on that score.

After opening statements, Lee took the stand. To hear him tell it, on March 3, 2018, he went to a bar called Vivian's Lounge ("Vivian's") in Troy to

"take in the scen[e]ry." Dkt. 91-3, p. 6. He testified that he asked a woman standing outside the bar to come in and have a drink with him. *Id.* at 7. Plaintiff then claimed that while he was talking to her, he struck up a conversation with another man standing nearby, because both of them were originally from New York City. *Id.* Plaintiff then claimed that he asked this new acquaintance if he knew anyone that sold marijuana. *Id.* at 7-8. The acquaintance responded that he did not, but that he happened to have some that he would be willing to sell to plaintiff. *Id.* at 8. Plaintiff testified that he bought some marijuana from the new acquaintance. *Id.* at 8-9.

Lee then testified that not long after the transaction, defendants arrived and directed him to put his hands against the wall. Dkt. 91-3, p. 9. He testified that he complied and told the officers he had nothing on him except for his prescription medication. *Id.* at 10. Plaintiff claimed that he began to reach into his pocket to show those medications to the police. *Id.* Suddenly, he felt an officer grab each of his arms. *Id.* Plaintiff testified that he asked the officers to "be a little bit easy" because he had recently had surgery. *Id.*

Lee claimed that the officers responded by hitting him in the back and legs with their knees. Dkt. 91-3, p. 11. Then, another officer grabbed him "from behind [his] neck" and pulled him back. *Id.* Plaintiff next claimed that the officer holding his right arm began to bend it painfully behind his back. *Id.* at 12. To alleviate the resulting pain, plaintiff testified that he began to spin

16

until he and the officers bounced off the wall, at which point plaintiff got down on his knees "so that [he] wouldn't hurt himself or be hurt." *Id.* at 13.

Once Lee was on the ground, he testified that he felt defendants on top of him. Dkt. 91-3, p. 14. Next, he felt "more knees going into [his] legs." *Id.* He then claimed that he felt repeated punches to his head. *Id.* at 14. Finally, he felt "one powerful blow" to the back of his head, followed by two more. *Id.* Plaintiff testified that the blows came with enough force to leave him "dazed" and "almost knocked [ ] out." *Id.*

After that, Lee recounted being arrested and taken to the police station. Dkt. 91-3, p. 15. Plaintiff testified that once there, the desk sergeant instructed the officers to take him to the hospital for a CAT scan. *Id.* at 16. Plaintiff claims that he presented at the hospital with abrasions, a laceration over the eye, and a hematoma. *Id.* at 17-18. Plaintiff was eventually taken to the Rensselaer County Jail, where he remained until he pled guilty to the charges for which defendants arrested him. *Id.* at 23, 27-28.

Lee also testified that he eventually heard that a barbershop near Vivian's had surveillance cameras that captured the entire altercation. Dkt. 91-3, pp. 29-30. Apparently, he and a friend went to the barbershop and watched the video. *Id.* at 30. After he saw the footage, plaintiff testified that he was so incensed to have pled guilty that he retained an attorney, Michael Feit, Esq. ("Mr. Feit") to attempt to withdraw his guilty plea. *Id.* at 31.

17

According to Lee, Mr. Feit obtained a copy of the video at some point after plaintiff saw it.  Dkt. 91-3, p. 32.  Plaintiff initially testified that he "believe[d]" that Mr. Feit got his hands on the video through a private investigator.  *Id.*  However, when plaintiff's counsel asked if the district attorney had been the source instead, plaintiff agreed that that was the case. *Id.* at 31.

In the course of Lee's testimony, P-12 was played almost in its entirety for the jury.  Dkt. 91-3, pp. 45-48.  At the end of P-12(A), plaintiff's counsel explained that the video is continuous, but that the three segments of P-12(A), (B), and (C) were just "the way that it's broken up."  *Id.* at 45.  At this point, defense counsel interjected "Judge, they manufactured that as well.  They cut off half the video, two-thirds of it.  That's not what was turned over to them.  That's not what they received from the police."  *Id.* at 45-46. Soon after, defense counsel moved to strike P-12(A) and (B).  *Id.* at 46.  That objection was not granted.  *Id.*  After the usual cross-examination, redirect, and re-cross, plaintiff's testimony concluded.  *Id.* at 87.

The next day, May 11, Lee called Jones to the stand.  Dkt. 91-4, pp. 2, 6. After Jones testified, plaintiff rested.  *Id.* at 54.  Defendants then called every remaining defendant to testify.  *Id.* at 56, 140, 169.  There was virtually no disagreement among the defendants' testimony.  They all agreed that they had been watching Vivian's to monitor for narcotics activity in the area.  *Id.*

18

at 9, 70, 145, 173-74.  They all agreed that defendant Justin Ashe ("Ashe") saw plaintiff engage in a hand-to-hand drug transaction.  *Id.* at 12, 72, 145, 174.  Defendants Ashe, Christopher Parker ("Parker") and Louis Perfetti ("Perfetti") all testified that they found cocaine near the scene of their altercation with plaintiff.  *Id.* at 112, 153, 186.  Parker and Perfetti testified that marijuana and hydrocodone tablets were also found when plaintiff was searched.  *Id.* at 153, 185.

Defendants were similarly unanimous in their claims that Jones's strikes using his arm were open-hand palm strikes to the shoulder and bicep, not the punches to the head that plaintiff recounted.  Dkt. 91-4, pp. 22-23, 80, 151, 183.  Jones, Ashe, and Perfetti were all adamant that they then saw Jones attempt only two knee strikes.  *Id.* at 24, 94-95, 184.  However, Parker testified that he did not see the knee strikes for himself on March 3, 2018, he only saw them on video.  *Id.* at 152.  Their testimony commonly described the first knee strike as missing altogether, and the second knee strike as landing on plaintiff's shoulder.  *Id.* at 24-25, 95, 184.

Three more points of defendants' testimony bear mentioning.  First, defendants testified that Lee resisted arrest throughout their encounter.  He began by reaching into his pocket or waistband, which the officers claimed to have reasonably perceived as a threat because plaintiff might have been reaching for a weapon.  Dkt. 91-4, pp. 13-14, 74, 147, 176.  When defendants

responded by trying to control plaintiff's arms, Parker testified that plaintiff

began to behave aggressively.  *Id.* at 147.  According defendants' testimony,

plaintiff then struggled, tried to escape, and refused to be handcuffed.  *Id.* at

19, 77, 148, 180.  He was still refusing to be handcuffed when Jones struck

him with his arm and knee.  *Id.* at 25, 81-82, 152, 184-85.

Most importantly of all, defendants all testified that Parker had exclaimed

that Lee had reached for his gun during the struggle.  Dkt. 91-4, pp. 22, 80,

150, 182.  Defendants testified that this happened right before Jones began to

use the palm strikes.  *Id.* at 22, 80, 151, *see id.* at 182-183 (defendant Perfetti

testifying he used knee strikes to plaintiff's legs at same time Jones used

palm strikes and right after Parker claimed plaintiff had grabbed gun).

Parker also testified that he looked around on the ground to check for his gun

in case it had fallen out of its holster.  *Id.* at 151.

Second, defendants Jones, Ashe, and Perfetti all testified that Lee

sustained the injuries to his face by falling to the ground.  Dkt. 91-4, pp. 40,

128, 204.  For his part, Parker only testified that plaintiff fell on his face.  *Id.*

at 149.  He did not testify that that fall caused plaintiff's injuries.  *See id.*

Third, during Jones's testimony, defendants again delved into the relative

legitimacy of plaintiff's version of the video.  Defense counsel asked Jones

how many knee strikes he used.  Dkt. 91-4, p. 24.  He responded "[o]nly two.

I am not sure how [plaintiff's] video was altered or—but it was only two knee

strikes." *Id.* As a follow-up, defense counsel asked him "[a]nd you have seen the official video that was taken by the police?" *Id.* At which point, the Court interjected "[l]et's not get into this video official—" and defense counsel moved on.[8] *Id.*

After every individual defendant testified, the defense rested.  Dkt. 91-4, p. 206.  The next morning, on May 12, 2021, the Court heard closing arguments.  *See* Dkt. 91-5, pp. 2, 10.  But before the jury was brought in, defendants' counsel raised one final issue.  *Id.* at 8.  Specifically, defense counsel asked that his closing argument not be interrupted by plaintiff's counsel unless he makes a "misstatement about the law." *Id.* at 8.

 Defendants' counsel's request was an unusual one.  Nevertheless, the Court granted it for two reasons.  First, the Court has a long-standing preference that opening and closing statements not be interrupted absent a compelling reason.  Opening and closing arguments provide the jury a framework for understanding the case, not to mention an opportunity to size up the attorneys presenting it.  In the Court's view, the jury should not be distracted during that critical juncture absent a significant breach.

Second, Lee's counsel's method of objection throughout trial—but especially during defendants' opening—was ineffective and distracting.

---

[8] Defense counsel only made one more mention of their version of the video being the "official" one on May 11, 2021.  Dkt. 91-4, p. 197.

Plaintiff's counsel would object by mumbling softly without rising from his chair.  *See* Dkt. 91-4, p. 3 (Court admonishing plaintiff's counsel for "muttering" and instructing him to stand and speak loudly when objecting). As a result, it was often unclear whether plaintiff was even objecting, which posed a grave risk of unnecessarily confusing the jury.  For both of these reasons, the Court admonished plaintiff's counsel as follows: "[y]ou cannot interrupt.  I will interrupt if he is inappropriate. . . . [Y]ou cannot interrupt his closing statement.  Understand?"  Dkt. 91-5, pp. 8-9.

So instructed, the parties began their closing statements.  Defendants' counsel began by thanking the jury for its service and elaborating on the importance of the jury to the function of the American judicial system. Dkt. 91-5, p. 10.  "It's what makes our country the greatest," he elaborated. *Id.*  "At least as far as we say[,] right?  The Europeans may claim a different set of circumstances, perhaps, I would think."[9]  *Id.*

Defendants' counsel then returned to a familiar line of argument. Concerning Lee's version of events, he declared "I submit to you that those are false[,] that they are fabricated."  Dkt. 91-5, p. 10.  He would hit that theme again later in his closing.  But more immediately, his tactics shifted to undermining any sympathy the jury may have had for plaintiff and playing

---

[9] One of plaintiff's attorneys is originally from Ireland and still has a noticeable Irish accent.

up any sympathies it may have had for defendants.  Defense counsel took plaintiff to task for his damages demand: "[Plaintiff] wants $3 million from [defendants].  How much do you think a cop makes?"  *Id.* at 11.

Defendants' counsel also took great pains to distance this case from others gathering media attention: "[T]here is a lot of media coverage of bad behavior by the police . . . but this isn't that kind of case."  Dkt. 91-5, p. 13.  He would later elaborate that "these types of false claims brought against good, dutiful officers undermine the legitimacy of those real issues; don't they?"  *Id.*

Then, defendants' counsel's tactics changed from ensuring that there was distance between his clients and other, more infamous members of their profession to using that distance to attack Lee as an unsympathetic character.  Defense counsel claimed that plaintiff "is attempting to capitalize on the antipolice sentiment now.  Going to come up from New York City with his New York City attorneys and hit a home run here in the Northern District [of New York] for $3 million on this case.  I say, no, that is not acceptable."  Dkt. 91-5, p. 15.

From there, defense counsel at last honed in on the differences between defendants' and Lee's versions of the video:

> Now I do want to talk for a moment about the difference between the two videos.  [Plaintiff's] video is not what was taken into evidence by the officers.  It's not what was seized by the Troy Police Department and put into the evidence bag that we showed you.  They manufactured it.  I don't think it really hurts, but it's

> duplicitous.  It's a further attempt to pull one over on us.  And
> how do we know that their video is not the accurate one?  Well,
> first of all, they edited out the drug deal.  It doesn't start with the
> drug deal.
>
> Secondly, they added in a knee strike.  There's only two knee
> strikes on the official video.  They spliced it together and they
> threw a third one in there.  And if you look carefully, they've got
> a caption at the bottom.  You don't caption on the official video
> [sic].

Dkt. 91-5, pp. 15-16.

Much of the rest of defense counsel's closing is spent on the more routine

exercise of framing the evidence in the light most favorable to defendants.

*See generally* Dkt. 91-5, *passim*.  Even so, defense counsel delved back into

the issue of the "official" video versus the "manufactured" video twice more.

*Id.* at 21 (noting during transition from D-8 to D-9 that "that's where the first

segment ends, as recovered on the official video"); *see id.* at 24 (describing gap

between D-8 and D-9 as "less than a fifteenth of a second, a quarter of a

second.  If you look at the time stamp between the two segments of the video,

it comes on instantaneously.  There's no lag in there with something edited

out").

As instructed, Lee's counsel did not object during defendants' counsel's

closing.  Neither did the Court interrupt.  Although the word "manufactured"

had been brandished regularly at trial, the Court had still never been given

the opportunity to compare D-8 and D-9 to P-12.  Without being able to

closely scrutinize the two versions, it was unclear to the Court at that point that there was a third knee strike in plaintiff's video that was absent from defendants'. In that light, the Court struggled to realize the full gravity of defendants' counsel's argument. Hating to see a closing argument—the second and last chance for an attorney to make his or her case directly to a jury—interrupted, the Court let defense counsel's remarks stand with no comment to the jury. *See* Dkt. 91-5, p. 33 (notifying defense counsel his time was up and thanking him with no further remarks to jury).

Finally, Lee's counsel began his closing statement. By and large, he described the evidence adduced at trial and argued how it helped to prove his client's case. *See generally* Dkt. 86, *passim*. But obviously, he could not let plaintiff's only statement about the veracity of P-12 be silence. To that end, plaintiff's counsel fired back at defendants' argument of manufacture:

> "[N]o, the video has not been doctored. Don't you think that if [defendants] really believed that the video was altered, they would have brought in a . . . video forensics expert to testify to that? Don't you think they would have at least brought in the video technician who is still employed by their own police department to explain how one video is authentic and the other one is not[?] You didn't hear any such testimony. All you heard was blatant allegations from [defendants' counsel] just throwing it out there[.] . . . Of course we didn't doctor a video. They know that the video that [Mr. Feit] got from the DA is the best, clearest, uninterrupted video of the incident. And that's why they don't like it. They don't want you to see what happened.

* * *

> Ladies and gentlemen, this video is not doctored.  This is the real, best video of what happened that night.  Don't you think it's a little convenient that the police department version is in two clips and a break happens at the most crucial point of the video and you lose a second or two in between at the most crucial actions that are taking place?

*Id.* at 11-13.

At the end of Lee's counsel's closing, the Court charged the jury.  Part of the jury's instructions informed them that "[t]he arguments, objections, and statements of the lawyers, as well as their questions to witnesses, standing alone, are not evidence."  Dkt. 74, p. 8.  Similarly, the jury was instructed that "[w]hat the lawyer says . . . is not binding on [them], and in the final analysis [their] own recollection and interpretation of the evidence controls [their] decision."  *Id.* at 5.  These admonitions echoed one that the Court had given the jury in its preliminary charge: "[O]pening statements . . . are simply outlines to help you understand the evidence as it comes in.  Opening statements are neither evidence nor arguments."  Dkt. 74-1, p. 15.

Specifically concerning the videos, the final instructions cautioned the jury to consider and rely on them to the same extent they would consider other materials and testimony.  Dkt. 74, p. 17.  The jury was charged to give the videos whatever weight they thought appropriate in carrying out their responsibility to determine the facts of the case.  *Id.*

The jury retired to deliberate.  At 2:07 p.m., they submitted a note asking to be able to watch P-12, D-8 and D-9, and to be able to pause and start them as needed.  Dkt. 73, p. 1.  The videos were played for the jury at 2:41 p.m. Text Minute Entry dated 5/12/2021.  At 3:30 p.m. the jury returned to the courtroom to announce their verdict of no cause of action against all defendants.  *Id.*; Dkt. 72.

### D. **The Present Motion Practice**

On June 9, 2021, Lee filed a motion for judgment as a matter of law notwithstanding the verdict under Rule 50(b) and for a new trial under Rule 59(a)(1)(A).  Principally, plaintiff argued that the verdict was not supported by the evidence or at least went against its weight.  Alternatively, plaintiff argued that defense counsel's comments about the provenance of the video and statements playing to regional bias disrupted his right to a fair trial. Defendants opposed on all fronts.  This decision follows.

## III.  **LEGAL STANDARDS**

### A. **Rule 50 Motion for Judgment as a Matter of Law**

Rule 50(b) allows a district court to enter judgment as a matter of law if a jury returns a verdict unsupported by legally sufficient evidence. FED. R. CIV. P. 50(b).  A ruling on a Rule 50 motion considers the entirety of the record evidence.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  In weighing that full record, the district court must

"draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Id.*  If there is evidence favorable to the moving party that a jury is not explicitly required to believe, the district court must disregard it.  *Id.* at 151.

Clearly, then, Rule 50 imposes a heavy burden.  *Cash v. Cty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011).  All the more so "where, as here, the jury has deliberated in the case and actually returned its verdict in favor of the non-movant." *Id.* (internal citations and quotation marks omitted).  A Rule 50 motion brought under those circumstances may be granted only "if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair[-]minded persons could not arrive at a verdict against [him]." *Id.*

## B. Rule 59 Motion for a New Trial

Rule 59 allows a district court to order a new jury trial "for any reason" that would have warranted a new trial before that Rule was adopted. FED. R. CIV. P. 59(a)(1)(A).  Those reasons include a verdict against the weight of the evidence, *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 417 (2d Cir. 2012), or for attorney misconduct, *Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d 534, 540 (2d Cir. 1992).  Unlike a motion for judgment

28

as a matter of law, a trial judge on a motion for a new trial "may weigh the evidence and the credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner." *Raedle*, 670 F.3d at 418.

Even so, "jury verdicts should be disturbed with great infrequency." *Raedle*, 670 F.3d at 418. The district court may not "freely substitute" its own "assessment of the credibility of witnesses for that of the jury" based solely on its disagreement with the verdict. *Id.* Instead, the district court should, "exercising a mature judicial discretion, . . . view the verdict in the overall setting of the trial[,] consider the character of the evidence and the complexity or simplicity of the legal principles which the jury was bound to apply to the facts[,] and abstain from interfering with the verdict unless it is quite clear that the jury has reached a seriously erroneous result." *Benevivo v. Saydjari*, 574 F.2d 676, 684 (2d Cir. 1978).

## IV. **DISCUSSION**

Lee's Rule 50 motion for judgment as a matter of law attacks the jury's verdict as unsupported by the evidence. Along similar lines, his Rule 59 motion for a new trial argues that the verdict went against weight of the evidence. Finally, plaintiff argues that defendants' counsel made improper and prejudicial comments throughout the trial. Each of those arguments will be tackled in turn.

### A. <u>Plaintiff's Motion for Judgment as a Matter of Law</u>

Deciding whether the verdict was supported by sufficient evidence first means clarifying what the jury's verdict needed to embrace.  To that end, an excessive force claim stemming from an arrest invokes the Fourth Amendment's protections.  *Graham v. Connor*, 490 U.S. 386, 394 (1989).  Under that Amendment, the relevant question is whether the force an officer used in securing an arrest "is objectively unreasonable in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation."  *Maxwell v. City of N.Y.*, 380 F.3d 106, 108 (2d Cir. 2004) (internal citations and quotation marks omitted).

Although "[t]he fact that a person whom a police officer attempts to arrest resists, threatens, or assaults the officer no doubt justifies the officer's use of some degree of force, . . . it does not give the officer license to use force without limit."  *Sullivan v. Gagnier*, 225 F.3d 161, 165-66 (2d Cir. 2000).  Instead, the force an officer uses "must be reasonably related to the nature of the resistance and the force used, threatened, or reasonably perceived to be threatened, against the officer."  *Id.* at 166.

Ultimately, the reasonableness of an officer's use of force boils down to "(1) the nature and severity of the crime leading to the arrest[;] (2) whether the suspect poses an immediate threat to the safety of the officer or others[;]

and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010).

Essentially, Lee argues that the incontrovertible video evidence plainly shows that, contrary to defendants' testimony, Jones kneed plaintiff in the back of the head three times. *Compare* P-12(B) 9:54:30-36, *with* Dkt. 91-4, pp. 24, 94-95, 152, 184. By plaintiff's logic, the video entitles the Court to disregard defendants' contrary narrative of only two knee strikes: one missing entirely and the other hitting plaintiff's shoulder. *See Scott v. Harris*, 550 U.S. 372 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record[ ] so that no jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); *see Zellner v. Summerlin*, 494 F.3d 344, 370-71 (2d Cir. 2007) (applying *Scott* in deciding judgment as matter of law).

Further, Lee points to a piece of testimony by Jones that to his mind is damning. Specifically, plaintiff's counsel asked Jones "would it be reasonable to knee [plaintiff] in the head in the circumstances that [were] shown on the video?" Dkt. 91-4, p. 32. Jones responded "[a]bsolutely not." *Id.* In short, plaintiff argues that the irrefutable record evidence shows Jones doing what he readily admits would be unreasonable, and that judgment as a matter of law should follow.

Lee is wrong for two reasons.  First, the duty of determining whether defendants used reasonable force on March 3, 2018 was the jury's alone. Jones's opinions on whether the force plaintiff believes he used was reasonable are beside the point and the jury was free to disagree with him. *See United States v. Schatzle*, 901 F.2d 252, 257 (2d Cir. 1990) (noting that reasonableness of force is ultimate issue for jury to resolve).

Second, the video evidence is not nearly so incontrovertible as Lee would paint it.  Much like the reasonableness of Lee's force, which version of the video to credit was also explicitly left to the jury.  Dkt. 74, p. 17 (instructing jury to weigh credibility of videos as they would any other evidence).  In defendants' version, there were only two knee strikes, and a reasonable juror could conclude that neither landed on plaintiff's head.  D-9, 9:54:31-36.

Once again, the Court must draw all inferences in defendants' favor in deciding a Rule 50 motion, which means the Court must assume that defendants' testimony about where the knee strikes landed is true.  *Reeves*, 530 U.S. at 150.  The same favorable inferences demand that the Court assume that plaintiff was actively resisting arrest.  *See id.*  Just as importantly, the Court must also assume that defendants' version of the video is the truthful one.  *See id.*  Operating under those assumptions, a fair-minded jury could certainly have concluded that defendants did not use excessive force in securing plaintiff's arrest.  *Cash*, 654 F.3d at 333.

Accordingly, Lee is not entitled to judgment as a matter of law on this

record.  Plaintiff's Rule 50 motion must therefore be denied.  *See, e.g.*, *Lawson*

*v. Cty. of Suffolk*, 920 F. Supp. 2d 332, 340-43 (E.D.N.Y. 2013) (denying Rule

50 motion where plaintiff argued that defendants' admissions at trial in

arrest excessive force claim merited judgment as matter of law because

defendants' testimony that plaintiff refused to be handcuffed merited some

use of force).

### B. Plaintiff's Motion for a New Trial

Next, the Court must consider Lee's Rule 59 motion.  That motion comes

under two theories.  First, and not unlike his Rule 50 motion, plaintiff claims

that the jury's verdict was against the weight of the credible evidence.

Second, plaintiff objects to varied comments made by defense counsel,

especially during summation.

### 1. Weight of the Credible Evidence

On Lee's first point, the Court notes that a "decision is against the weight

of the evidence if and only if the verdict is (1) seriously erroneous or (2) a

miscarriage of justice."  *Raedle*, 670 F.3d at 417-18 (cleaned up).  That said, a

new trial "may be granted even if there is substantial evidence to support the

jury's verdict."  *Song v. Ives Labs., Inc.*, 957 F.2d 1041, 1047 (2d Cir. 1992).

Lee argues that the jury's verdict amounted a miscarriage of justice

because: (1) all four officers testified that Jones only kneed plaintiff twice

although his version of the video showed three knee strikes; (2) all four officers unreasonably claimed in hospital records that plaintiff suffered injuries on the night of March 3, 2018 by falling on his face from a standing position; and (3) defendants testified that plaintiff attempted to steal Parker's duty weapon despite the video showing that it would be almost impossible for plaintiff to have reached Parker's gun.

Once again, Lee's showing is not enough to disturb the verdict. First, plaintiff errs by assuming that his version of the video is worthy of credit. There are two versions of the video in play, both identical except at the most crucial point in the recording. *Compare* P-12(B), 9:54:30-36, *with* D-8, 9:54:30-31; D-9, 9:54:31-36. At that point, there is footage in plaintiff's version that is missing from defendants'.

The Court is open to any number of possibilities for how that difference came about. But among those hypothetical causes for the diverging versions is the possibility that either Lee added something into his video or that defendants cut something out of theirs. Should either of those prove to be true, the consequences both in and beyond this case would be severe. *See Crawford v. City of New London*, 2014 WL 2168430, at *2 (D. Conn. May 23, 2014) (considering spoliation instruction and sanctions as possibility if party destroyed or materially altered evidence).

Given that possibility, the Court cannot lightly adopt one version of the video over the other on this record.  Accordingly, defendants' version showed only two knee strikes by Jones, and defendants' testimony in line with that version cannot be discarded out of hand.  *See* D-9, 9:54:31-36 (showing two knee strikes); Dkt. 91-4, pp. 24, 94-95, 152, 184 (defendants testifying that Jones only used two knee strikes).

Second, Lee does correctly point out that defendants' testimony that he suffered injuries by falling on his face is difficult to swallow given the video evidence.  The videos both show plaintiff being dragged down from a standing position and  falling to his knees and elbows.  P-12(B), 9:53:58-59; D-8, 9:53:58-59.  As defendants mill around him, the viewer gets a clear shot of plaintiff's hat—still on his head—being pressed into the ground, which forces the bill to bend.  P-12(B), 9:53:59-54:02; D-8, 9:53:59-54:02.  The Court entertains some skepticism that plaintiff hit the ground hard enough to cause a hematoma but did not fall hard enough to knock his baseball cap off his head.

Regardless, even assuming that defendants' claim that plaintiff hit his face on the ground was not worthy of credit in light of the video, that by itself is not enough to call the verdict into question.  In fact, Lee testified that he was not brought down by the officers at all.  Dkt. 91-3, p. 13.  Instead, he claimed that he voluntarily went down to prevent further damage to himself.

35

*Id.* That testimony is contradicted at least as much by the video as was defendants' assertion.  P-12(B), 9:53:58-54:02 (showing four defendants physically and with effort dragging plaintiff to the ground); D-8, 9:53:58-54:02 (same).

Lee might counter that defendants' dubious testimony was more important.  After all, by plaintiff's logic, if he did not hit his head falling to the ground, it is all the more likely that Jones' knee strikes were the cause of his injuries.  And if Jones' knee strikes were the cause of damage to plaintiff's face, it is all the more likely that Jones kneed him in the back of the head. But that line of argument misses the point.  Even assuming that Jones *did* knee plaintiff in the back of the head, if a reasonable jury could have concluded that Jones believed that plaintiff had tried to grab Parker's gun, that jury could justifiably have found Jones' kneeing plaintiff's head to be reasonable in light of the perceived danger.

Which segues into Lee's third and final argument.  That argument, that it would have been physically impossible for plaintiff to have grabbed Parker's gun, is similarly irrelevant.  All that matters is whether Jones reasonably believed that he had.  *See Sullivan*, 225 F.3d at 166 (holding that use of force must be tied to threat officer reasonably perceives).  Every officer testified that Parker had felt something pull his gun belt, causing him to exclaim that plaintiff had gone for his gun.   Dkt. 91-4, pp. 22, 80, 150, 182.

It is easy to say in hindsight that it was improbable—to say the least—that Lee was the one who tugged on Parker's gun belt. Even so, the Court cannot now say that it would have been unreasonable for Parker to have perceived it as happening in the moment. If the jury credited defendants' testimony that Parker felt a pull on his gun belt and exclaimed to that effect, then the jury also could have justifiably determined that Jones's use of force in total was reasonable. Plaintiff has not pointed to anything in the record so severe as to take from the jury the right to find defendants credible on that score.

In sum, Lee has pointed to no glaring imbalance in the respective strength of the record evidence that makes the Court concerned that letting the jury's verdict stand would amount to a miscarriage of justice. Defendants' Rule 59 motion based on the weight of the evidence must be denied. *See, e.g.*, *Hollins v. City of N.Y.*, 761 F. App'x 15, 17-18 (2d Cir. 2019) (summary order) (affirming denial of Rule 59 motion where conflicting evidence meant question of excessive force was properly left to jury).

### 2. Conduct of Defense Counsel

Lee raises one final argument in the alternative to advance his motion for a new trial. Specifically, plaintiff argues that defense counsel acted improperly and to his detriment throughout his first bite at the apple.

37

Generally speaking, a court may order a new trial for attorney misconduct only when "the conduct of counsel in argument causes prejudice to the opposing party and unfairly influences a jury's verdict." *Pappas*, 963 F.2d at 540. By way of example, new trials have been awarded when

> "(1) the attorney improperly arouses the sympathy of the jury and thereby causes unfair prejudice to the opposing party and unfairly influences the jury's verdict; or (2) the attorney refers to his or her personal opinions regarding the evidence in the case, the truthfulness of the witnesses or the liability of a party, and thereby causes unfair prejudice to the opposing party and unfairly influences the jury's verdict."

*Byrd v. Janssen Pharm., Inc.*, 333 F. Supp. 3d 111, 133 (N.D.N.Y. 2018).

Of course, "not all misconduct of counsel taints a verdict to such a degree as to warrant a new trial." *Pappas*, 963 F.2d at 540. Rather, a district court uses its discretion and evaluates "the context of the trial as a whole, examining, among other things, the totality of the circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, and the manner in which the parties and the court treated the comments." *Graham v. City of N.Y.*, 128 F. Supp. 3d 681, 698 (E.D.N.Y. 2015). All told, "a party is entitled to a new trial when opposing counsel's conduct causes prejudice to that party thereby unfairly influencing its verdict." *Tesser v. Bd. of Educ.*, 370 F.3d 314, 321 (2d Cir. 2004) (cleaned up).

Lee points to three improprieties in defendants' counsel's presentation of its case: (1) playing to regional bias during closing arguments by touting the virtues of the American justice system and comparing it to European systems as a veiled slight at plaintiff's counsel's Irish origins; (2) playing to regional bias and painting plaintiff as an unscrupulous opportunist during closing arguments by arguing plaintiff's plan was "to come up from New York City with his New York City attorneys and hit a home run here in the Northern District [of New York] for $3 million"; and (3) attacking the legitimacy of plaintiff's version of the video and accusing plaintiff and his counsel of fabricating it throughout trial. Dkt. 91-5, p. 15.

Determining whether Lee's arguments call for a new trial involves asking two questions. First, was any comment or line of argument plaintiff complains of actually improper? Second, considering the totality of the circumstances, did any improper comments so prejudice the jury as to deny plaintiff his right to a fair trial?

### a. __Comment Concerning European Justice System__

Lee's first two claimed improprieties both involve defendants' counsel's alleged attempts to stoke regional bias against him. On the first point, plaintiff claims that defense counsel's comment that jury duty is "what makes our country the greatest. At least as far as we say[,] right? The Europeans

may claim a different set of circumstances, perhaps, I would think" was intended to poke at plaintiff's attorney's Irish heritage.  Dkt. 91-5, p. 10.

But defendants deny any intent at attack.  Instead, defendants note that one of the jurors studied European police practices professionally.  This explanation is plausible, and defendants' counsel's statement was not improper.

### b. Comment Concerning "Home Run" in Northern District

The next comment that Lee puts at issue is defense counsel's statement during closing essentially accusing plaintiff of opportunistically coming from New York City to take advantage of the Northern District.  Dkt. 91-5, p. 15. This comment is potentially problematic both for its invocation of regional bias and for the way it paints plaintiff's claims as a transparent money grab.

In *Pappas*, the Second Circuit reversed a district court's denial of a Rule 59 motion for a new trial based on comments that do not look all that different from the ones to which Lee objects.  963 F.2d 534.  In that case, the plaintiff was a New Jersey native injured in Vermont.  *Id.* at 535.  He sued the defendant—the owner of a condominium where he had been vacationing—in the District of Vermont to redress the injury he concededly suffered in that state.  *Id.*  In summation, defense counsel complained that the plaintiff and those like him

> can come up here from New Jersey to Vermont to enjoy what we
> experience every year, . . . and without a care in the world for
> their own safety when they encounter what we, ourselves do not
> take for granted, and they can injure themselves, and they can sit
> back and say . . . ["]I'd like you to retire me.  Retire me now.  Pay
> me now what I would get or what I claim I would get until I work
> for age 65[."]

*Id.* at 536-37.

In other words, the Second Circuit found a defense attorney's statement in closing that a plaintiff was trying to come from elsewhere to win an exorbitant sum from the locals (in other words, the jury) so problematic that it overrode the district court's denial of a Rule 59 motion.  *Pappas*, 963 F.2d at 541.  In this case, meanwhile, defendants' counsel argued in closing that Lee was trying to come from elsewhere to win an exorbitant sum from the locals (in other words, the jury).  Dkt. 91-5, p. 15.  That comment was improper.

### c.  Provenance of Plaintiff's Exhibit 12

Lee's final alleged impropriety[10] by the defense takes issue not with one comment, but with many.  Particularly, plaintiff draws the Court's attention

---

[10] Plaintiff also complains that defendants' counsel improperly hypothesized about the injuries plaintiff would have had if he had actually been kneed in the head, discussed the purpose of plea bargains and the cost of incarcerations, and misstated the applicable legal standard by suggesting that Jones should not be held liable if he only accidentally hit plaintiff in the head.  The Court has also considered each of these comments and finds them insufficiently improper to be worth delving into further.

to the consistent through line in defendants' presentation of the case that plaintiff's version of the video was fabricated while defendants' was "official."

By the Court's count, defendants' counsel made a statement along those lines nine times throughout trial, with every day of trial getting at least two unique variations on the attack. For clarity's sake, those nine instances bear repeating here.

First, during opening statements on May 10, 2021, defense counsel said of the video: "[Plaintiff's] video is manufactured. They made it. It's not the video that was taken into possession by the police . . . . They left out the drug deal . . . ." Dkt. 91-2, p. 5.

Second, also during his opening, defense counsel said that Jones delivered "two knee strikes; not the three that they have in their manufactured video, because that's not on the original video." Dkt. 91-2, p. 11.

Third, while Lee's counsel was introducing the jury to P-12, defendants' counsel claimed "Judge, they manufactured that as well. They cut off half the video, two-thirds of it. That's not what was turned over to them. That's not what they received from the police." Dkt. 91-3, pp. 45-46. During the same colloquy, when plaintiff was making the change from P-12(A) to P-12(B), defendants' counsel interjected: "Your Honor, that is not the video, either. That's the first one they showed." *Id.* at 47.

Fourth, on May 11, 2021, Jones testified that he only used two knee strikes in arresting Lee.  Dkt. 91-4, p. 24.  He then elaborated "I am not sure how [plaintiff's] video was altered or—but it was only two knee strikes."  *Id.* Defendants' counsel followed up by asking Jones if he had "seen the official video that was taken by the police[.]"  *Id.*

Fifth, also on May 11, defendants' attorney once again referred to their version of the video as "the official video that the police took into evidence." Dkt. 91-4, p. 197.

Sixth, at the beginning of his closing statement on May 12, 2021, defendants' attorney called Lee's version of events "fabricated."  Dkt. 91-5, p. 10.

Seventh, defendants' attorney discussed his opinion of the comparative value of the two videos.  Dkt. 91-5, pp. 15-16.  The Court will not reproduce the entire discussion for a second time.  But as a quick summary, defense counsel accused Lee of manufacturing his version of the video again.  *Id.*  As evidence, defendants' attorney claimed that plaintiff edited out the drug deal, added in a third knee strike, and inserted a caption at the bottom.  *Id.* at 16. Once again, defendants' attorney consistently refers to defendants' version of the video as the "official" one throughout this discussion.  *See id.* at 16.

Eighth, defendants' attorney played D-8 for the jury during his closing.  At the end of D-8, he said "that's where the first segment ends, as recovered on the official video."  Dkt. 91-5, p. 21.

Ninth, defense counsel argued that the missing portion of video was "less than a fifteenth of a second, a quarter of a second" with "no lag in there with something edited out."  Dkt. 91-5, p. 24.

Defendants argue that none of these statements were improper.  Reading all of defendants' filings together as generously as possible, they defend the propriety of these remarks in six ways.  First, defendants argue that Lee's introducing his version of the video so late in the game—eleven days before trial—suggests impropriety.  Dkt. 90-2, ¶ 12 (affirming that C-1(B) was first disclosed to defendants on April 29, 2021).

As Lee correctly points out, though, defendants were told during discovery in full compliance with Rule 26 that plaintiff already had access to his own version of the video.  Dkt. 33-5, p. 2 (plaintiff disclosing to defendants that he had his own version of video).  Informing defendants of evidence in his possession is all that the Rules ask of him, and defendants have no one but themselves to blame for not asking to see his version in discovery.  *But see Mulero v. Walsh*, 2018 WL 1084235, at *8-9 (M.D. Pa. Feb. 28, 2018) (prohibiting use of video at trial when defendants failed to disclose

surveillance video within fourteen days of case management conference as required by Rule 26(a), unlike plaintiffs in this case).

Neither can Lee be entirely blamed for not realizing the extent of the difference between the two videos sooner. As Ashe himself pointed out, the time gap in defendants' version of the video is less than a second long, making it extremely difficult to spot if the viewer is not looking for it. *See* C-1(A), 9:54:29-33; Dkt. 91-4, p. 116 (defendant Ashe acknowledging brief gap in defendants' version of video). Accordingly, defendants' reliance on the late disclosure of C-1(B) and by extension P-12 to impute deception on plaintiff is misplaced.

Second, defendants argue that Lee's inconsistent efforts to lay a foundation for where C-1(B) and P-12 came from justify defense counsel's aggressive stance on the legitimacy of plaintiff's version of the video. The Court is once again unmoved. As defendants would have it, plaintiff presented three different sources for his version of the video: (1) he got it himself from the barbershop; (2) Mr. Feit got it from a private investigator; and (3) Mr. Feit got it from the District Attorney's Office.

But defendants are splitting hairs. Lee never claimed that he personally retrieved the video from the barbershop: he only claimed that he watched it there. Dkt. 91-3, p. 30; *see* Dkt. 85, p. 9 (plaintiff's counsel in opening claiming that Lee saw video recording of arrest at barbershop but not

45

claiming he retrieved video).  That testimony is in no way inherently

inconsistent with Mr. Feit being the source of the video that plaintiff brought

to trial.  *Compare* Dkt. 91-3, p. 30 (plaintiff testifying that he watched video

at barbershop), *with id.* at 32 (plaintiff testifying that Mr. Feit secured copy

of video).

Similarly, that Lee needed his memory refreshed as to how Mr. Feit

himself got his hands on the video may undermine plaintiff's credibility, but

not enough to unravel the foundation for his version.  *Id.* at 32 (plaintiff

initially claiming he "believe[d]" Mr. Feit got video from private investigator

before confirming that District Attorney's Office was actual source).

Defendants' second argument that plaintiff's version of the video deserved

to be rejected on its face thus also misses the mark.[11]  *Cf., e.g.*, *Lomascolo v.*

*Otto Oldsmobile-Cadillac, Inc.*, 253 F. Supp. 2d 354, 358 (N.D.N.Y. 2003)

(noting that refreshing recollection only impeaches witness's credibility if the

degree of refreshment required is significant).

---

[11] Defendants argue that plaintiff should have been required to have Mr. Feit or his private investigator (if there ever was one) testify in order to lay a proper foundation for P-12.  This argument is curious because defendants did not have the evidence technician who collected D-8 and D-9 testify, either.  Dkt. 91-4, p. 117 (Ashe relating that evidence technician recovered D-8 and D-9 from barbershop).  On its face, this seems to be something of a double standard.  Perhaps defendants would rely on Ashe's physical presence while the footage was collected to differentiate their foundation from plaintiff's, but the Court notes that Ashe freely disavowed any knowledge of whether the video was collected in one file or not because he is "not a very technologically sound person." *Id.*

Third, defendants argue that Lee's version of the video has a caption on it that is missing from defendants' version. At this point, the Court has reviewed all seven video clips countless times and has noticed no captions at all, let alone different ones. *See generally* C-1(A); C-1(B). To whatever extent there is a difference, the Court is confident it is not significant. Defendants' third argument must also be rejected.

Fourth, defendants make an issue of C-1(B) and P-12(B) running slower than C-1(A), P-12(A), and P-12(C). But as the Court discussed at length above, there is precious little consistency in speed across any of the different sets of videos. In fact, D-8 and D-9 are by far the most different in speed from every other version, running at one-and-two-thirds real time. *See generally* D-8; D-9.

Perhaps D-8 and D-9 are the native speed of the video, and every other version was slowed down. But the Court cannot simply assume that to be the case without evidence. Even if it could, it is doubtful that altering the playback speed of a video amounts to impropriety in any case. *See United States v. Anderson*, 555 F. App'x 589, 593 (6th Cir. 2014) (summary order) (finding no impropriety in considering video despite investigator in criminal case altering lighting and playback speed of surveillance tape). Defendants' fourth argument for rejecting Lee's version of the video also fails.

Fifth, defendants argue that Lee omitted the drug transaction from his version of the video.  Once again, defendants' argument must be rejected.  P-12(A) included the drug transaction, and the jury saw that clip in its entirety.  Dkt. 91-3, p. 45.  And in any case, even if plaintiff had only shown the jury C-1(B) or P-12(B), defendants were well aware of and had access to the footage of the drug deal.  *See* D-8, 9:51:00-52:40 (showing hand-to-hand drug transaction involving plaintiff).

A plaintiff is under no obligation to show the jury every piece of evidence unfavorable to his case.  *Cf. United States v. Muyet*, 1998 WL 26195 (S.D.N.Y. Jan. 22, 1998) (noting that "what evidence should be introduced" is tactical decision for attorney).  Lee made no effort to hide the drug deal either from the jury or defendants.  This argument also does not undermine plaintiff's credibility in presenting P-12.[12]

Sixth, defendants argue that Lee added a third knee strike into P-12.  As discussed above, defendants have openly attacked P-12's third knee strike as "duplicitous" and manufactured, an effort to "pull one over" on the jury.  Dkt. 91-5, pp. 15-16.  For his part, plaintiff has taken the more moderate approach of adamantly denying doctoring his version of the video.

---

[12] Defendants' attempt to spin plaintiff's dividing his version of the video into three parts into an admission of manufacture is unavailing for the same reasons.  The jury saw the relevant parts of P-12(A-C), and there is no reason to impute malevolence into plaintiff's decision to subdivide the video into digestible reference points.

Dkt. 86, pp. 11-13.  Otherwise, plaintiff only pointed out how "convenient" it was that defendants' video stopped at such a crucial point in arguing that P-12 is the best and clearest version of the video taken on March 3, 2018. Dkt. 86, pp. 11-13.

The Court always intended for the issue of which version of the video to credit to be left for the jury to resolve.  Dkt. 74, p. 17 (instructing jury that they were responsible for judging weight of videos).  There was good reason for that.  Contrary to defendants' counsel's arguments, *something* happened in the changeover from D-8 to D-9.  Dkt. 91-5, p. 24 (defendants' counsel claiming that time missing from defendants' version of video was too minimal for anything to have been edited out).

It is difficult to argue otherwise when Lee's baseball cap is in one spot when D-8 ends and another when D-9 begins.  *Compare* D-8, 9:54:30-31 (showing plaintiff's hat stationary by Jones's right knee), *with* D-9, 9:54:31 (showing plaintiff's hat at least foot to right and rolling away from Jones's right knee).  What that something was and whether it was what P-12 captured was a jury question—not damning evidence of P-12's falsehood.  *See De La Rosa Martinez v. Harbor Express, LLC*, 2021 WL 1051623, at *4 (S.D.N.Y. Mar. 18, 2021) (noting that how much weight to assign video and "what inferences to draw from this evidence are the functions of a jury").

49

Having discarded defendants' arguments that they were entitled to declare P-12 to be manufactured,[13] the remaining question is whether their attacking P-12 without that justification was improper.  To that end, in the Second Circuit, attorneys may not make comments to the jury that are "so inflammatory or so unsupported by the record as to affect the integrity of the trial."  *Marcic v. Reinauer Transp. Cos.*, 397 F.3d 120, 127 (2d Cir. 2005) (requiring attorney comments to be deeply inflammatory or unsupported by the record to merit new trial under Rule 59).  As the Court has just discussed at length, there is no discernible support in the record for defendants' counsel's repeated assertion that P-12 was "manufactured."  The nine statements to that effect were improper.

### d.  **Prejudicial Effect of Improper Comments**

Even having decided that defense counsel's conduct was at times inflammatory and at others unsupported by the record, whether that conduct undermined the integrity of the trial is a separate issue.  *Marcic*, 397 F.3d at 127.  In considering that separate issue, the first thing to point out is that

---

[13] To whatever extent defendants might alternatively argue that plaintiff's version of the video was inherently more likely to be fabricated because defendants' version was collected by the police and therefore "official," the Court notes that the fact that evidence comes from the police does not mean it is entitled to any greater weight.  *Cf. McKinnon v. Superintendent, Great Meadow Corr. Facility*, 422 F. App'x 69, 73-74 (2d Cir. 2011) (summary order) (approving of district court's instruction that police witnesses are not entitled to any greater weight simply because witnesses are police officers).

defendants' comments invoking regional bias are not enough on their own to undermine the integrity of the trial.

Lee points to *Pappas* in inviting the Court to reach the opposite conclusion, but that case was not this one.  963 F.2d 534.  In *Pappas*, the Second Circuit relied on four unique wrinkles in ordering a new trial.  *See id.* at 540-41.  First, the district court overruled plaintiff's attorney's objection to the defense attorney's play on regional bias.  *Id.* at 540.  Second, the district court did not provide a curative instruction to alleviate any prejudice from the problematic comment.  *Id.*  Third, the district court only gave a standard curative charge to address the comment.  *Id.*  Fourth, and most significantly, defendants in *Pappas* won despite having next to no defense *other* than regional bias.  *Id.* (noting that defendants presented no evidence or witnesses and only gave exceptionally brief summation including regional attack).

Although Lee's counsel's failure to object during closing is a complicated issue that the Court will address more fully later on, the central difference between this case and *Pappas* is the much more substantial defense these defendants mounted.  *See* 963 F.2d at 540.  Defendants presented their own witnesses and evidence, and defense counsel's New York City comment was only a minor portion of an hour-long closing.  *See generally* Dkts. 91-4, *passim*; 91-5, *passim*.

By extension, defense counsel's accusations that Lee was hoping to "come up from New York City with his New York City attorneys and hit a home run here in the Northern District [of New York] for $3 million on this case" may have prejudiced plaintiff's case, and they are certainly worth considering in probing whether plaintiff was prejudiced by defendants' counsel's conduct. But they were not nearly enough standing alone to undermine plaintiff's right to a fair trial. *Compare* Dkt. 91-5, p. 15 (singular comment driving at regional bias), *with Pappas*, 963 F.2d at 540-41 (ordering new trial where references to regional bias featured prominently in prevailing party's case).

Yet stacking defendants' attorney's New York City comment next to the nine attacks on the legitimacy of Lee's version of the video leads to a very different conclusion. *Graham*, 128 F. Supp. 3d at 698 (noting that impropriety of attorney comments looks at entirety of trial record). The video was the heart of the trial, as should be evident from how much time has been spent discussing it in this memorandum-decision and order.

Every issue for the jury to decide was captured, albeit imperfectly, for them to see for themselves in reaching a decision. And during every day of the trial, defendants denigrated Lee's version of that video without any justified basis for doing so. To be sure, defendants correctly point out that plaintiff gave them too little time to secure an expert to provide an evidentiary basis to attack the legitimacy of plaintiff's version. Plaintiff only

presented C-1(B) to defendants eleven days before trial, long after Rule 26(a)(2)'s ninety-day window for expert disclosures had closed. *Hall v. Briggs*, 216 F.3d 1072, at *2 (2d Cir. 2000) (unpublished table decision) (excluding expert testimony because proponent failed to disclose expert at least ninety days before trial as required by Rule 26(a)(2)).

However, the solution to being backed into that corner was to bring that issue to the Court's attention. Once the Court was up to speed, defendants could either have asked for an adjournment of trial or permission to introduce a video expert out of time. The surprise at Lee's late introduction of his own version of the video could very well have opened the door for defendants to have brought in a video expert of their own. *See Hall*, 216 F.3d at *2 (noting that "valid excuse for failure to give timely notice" would allow for calling expert after Rule 26(a)(2) deadline). The solution was not to go on the offensive without any evidence to support that plaintiff's version of the video was fabricated.

Clearly, then, that unsupported attack on a crucial piece of evidence meant to be considered by the jury caused substantial prejudice. *Graham*, 128 F. Supp. 3d at 698 (stating that relevancy of attorney comments to real issues before jury is essential to new trial inquiry). The question is whether the parties and the Court nevertheless handled defendants' errant strategy well enough to protect the fairness of Lee's trial. *See id.* (noting that "manner

in which the parties and the court treated the comments" is part of totality of circumstances to be considered).

They did not.  In fact, both parties and even this Court must share a certain degree of blame for how the video dispute was handled.  Lee waited too long to bring the discrepancies between his version of the video and defendants' to light.  Though defendants were understandably caught off guard by plaintiff's sudden about-face on which version of the video he would look to introduce, they still failed to bring the competing versions of the video to the Court's attention until immediately before trial.

The end result of these two failures was the Court's being blindsided on the morning trial began with a dispute every bit as grave in import as it was in implication.  Knocked off balance in its own right, the Court can now say from the clarity of hindsight that it is dissatisfied with its—and the parties'— handling of the dispute concerning the videos both before and during trial.

Other than routine jury instructions concerning the evidentiary value of attorney questions and arguments, the Court's only reference to the competing versions of the video was a single remark during the examination of one witness: "[l]et's not get into this [official] video" language.  Dkt. 91-4, p. 24.  Given the consistency of defendants' attack and the importance of the video, this one comment was not enough.

54

But why should Lee benefit from a disaster for which he was responsible in part?  Because he did not actively capitalize off of that disaster.  He did not turn the uncertainty to his advantage and make unsupported claims to the jury to bolster his position.  Defendants did.  Defendants took every irregularity in the process of showing that video to the jury and used it to paint plaintiff's counsel as swindlers attempting to capitalize off the locals with a falsified video.  *See* Dkt. 91-5, p. 15 (defense counsel claiming plaintiff was coming up from New York City to "hit a home run"); *see also* Dkts. 91-2, pp. 5, 11; 91-3, pp. 45-47; 91-4, pp. 24, 197; 91-5, pp. 10, 15-16, 21, 24 (accusing plaintiff of presenting manufactured video in contrast with defendants' "official" video).

Defendants may be right.  Lee's counsel may have edited the video to their advantage.  But defendants might have done the same.  The Court was in no position to rule on that issue when caught completely unprepared by it right before trial.  And there remains a legitimate question as to whether either party committed sanctionable evidence tampering.  *See Crawford*, 2014 WL 2168430, at *2 (noting that altering evidence may be worthy of sanctions).

Defendants' flippant and thus far unsubstantiated allegations made repeatedly in front of the jury leave the Court no choice but to order a new trial.  *See, e.g.*, *Byrd*, 333 F. Supp. 3d at 134 (finding new trial warranted

where plaintiff's attorney improperly bolstered credibility of plaintiff's expert witness, discussed his own competence and credibility, pushed for verdict based on sympathy, and suggested intent by defendants to mislead witnesses).

Defendants see things otherwise. To their mind, the Court's final instructions that attorney arguments are not evidence cures any wrongdoing on their counsel's part. Dkt. 74, p. 8. In support, defendants rely on *Tesser*. 370 F.3d 314. On its face, *Tesser* looks not unlike this case, just inverted. Instead of accusing the plaintiff of adding something in like defendants did in this case, the *Tesser* defendants accused the plaintiff of deleting the end of a tape recording to mislead the jury. *Compare id.* at 317, *with* Dkts. 91-2, pp. 5, 11; 91-3, pp. 45-47; 91-4, pp. 24, 197; 91-5, pp. 10, 15-16, 21, 24.

However, there are three major differences between the two cases that make *Tesser* a poor fit. First, in *Tesser*, defense counsel made a single speculative comment in summation. 370 F.3d at 317. In this case, defense counsel made nine throughout the trial. Dkts. 91-2, pp. 5, 11; 91-3, pp. 45-47; 91-4, pp. 24, 197; 91-5, pp. 10, 15-16, 21, 24. Second, and unlike in *Tesser*, defense counsel in this case also improperly attacked plaintiff's credibility through regional bias. Dkt. 91-5, p. 15.

Third, and most importantly, the Court in *Tesser* "invited [the plaintiff's] counsel to object to the remarks . . . and to suggest remedies for any

prejudice . . . the remarks may have caused." 370 F.3d at 317. The Second Circuit specifically upheld the district court's denial of a new trial because the district court gave the plaintiff the exact remedy she had requested to cure the prejudice. *Id.* at 322. This Court cannot claim the same defense for its handling of defendants' counsel's comments.

And although the Court used a very similar final instruction to the one in *Tesser* to ensure that the jury knew that the arguments of counsel were not evidence, that instruction alone does not undo the prejudice in this case. *Compare* 370 F.3d at 318 (repeating district court's instruction that "[t]he questions, arguments, remarks and summations of the attorneys are not evidence"), *with* Dkt. 74, p. 8 (instructing jury that "[t]he arguments, objections, and statements of the lawyers, as well as their questions to witnesses, standing alone, are not evidence").

Unlike in *Tesser*, defendants' counsel's comments were too frequent for a blanket instruction to cure. In addition, it is worth noting that the curative instruction concerning attorney arguments did nothing to address Jones's speculation on the stand that Lee's video was fabricated. Dkt. 91-4, p. 24. These deficiencies leave the Court dissatisfied that its curative instruction was enough to address the prejudice from defendants' counsel's comments.

As an alternative, defendants point out that Lee's Rule 59 motion should be denied because of his attorney's consistent failure to object to defense

counsel's comments.  Needless to say, plaintiff's counsel's failure to object does not help his case, and make ruling on plaintiff's motion an even closer call than it would be otherwise.

But the conduct of the opposing party is only one part of the totality of the circumstances the Court is bound to consider in deciding a Rule 59 motion. *Graham*, 128 F. Supp. 3d at 698.  And to be entirely fair to plaintiff's counsel, the Court was less than artful in instructing him that he "cannot interrupt" defendants' counsel's summation instead of ordering him to object only when there is a legitimate basis.  Dkt. 91-5, pp. 8-9.

Indeed, defendants' counsel saved his most aggressive attack on the legitimacy of the video for his summation.  *See generally id.* at 10-33.  The defense also raised the issue of regional bias for the first time after the Court instructed Lee's counsel not to object.  *Id.* at 15.  And although defendants' counsel did not ask for that instruction to be framed quite as broadly as the Court made it, it still bears emphasis that defendants' attorney took full advantage of the instruction once he got it.  *See generally id.*

However, Lee's attorney took full advantage of his reciprocal instruction in his own right.  Plaintiff's counsel spent some few minutes of his own closing argument discussing defendants' allegations that P-12 was fabricated. Dkt. 86, pp. 11-13.  Plaintiff's counsel forcefully denied that anyone in plaintiff's camp had altered the video, pointed out defendants' lack of

evidence that anyone had, and even suggested that it made more sense that defendants were the ones to alter it. *Id.*

Lee's counsel's effective handling of the manufacture argument is also certainly a relevant factor of the totality. *Graham*, 128 F. Supp. 3d at 698. Yet for three reasons it still is not enough to disturb the Court's conviction that a new trial is warranted.

First, because defendants had hammered on the falsehood of plaintiff's video for three full days before plaintiff finally addressed the point. Second, because the Court did not adequately ensure a level playing field between the parties by providing a curative instruction or a specific admonishment to the jury that which version of the video to credit was up to it to decide. And third, because it would be a puzzling outcome indeed if plaintiff were to be punished by denying his motion because his attorney briefly, but effectively, addressed an otherwise unaddressed issue.

In sum, between defendants' counsel's playing up regional bias and repeatedly attacking the veracity of Lee's version of the video without a good faith basis for doing so, plaintiff's right to a fair trial was denied. The video was the most important evidence that either party brought to bear, and defendants' unsupported attacks on its legitimacy and irrelevant attacks on plaintiff's character demand a new trial under the totality of the circumstances. *Graham*, 128 F. Supp. 3d at 698.

The jury's May 12, 2021 verdict must therefore be vacated, and the parties proceed to trial again.[14]  *See, e.g.*, *Byrd*, 333 F. Supp. 3d at 133-35 (ruling that new trial was warranted despite curative instructions due to attorney misconduct).

## V. <u>CONCLUSION</u>

The jury trial in this case from May 10 through May 12, 2021 was precisely the sort of mess that can be expected when a trial court gets caught flat-footed.  It bears repeating one last time that both parties failed to bring to the Court's attention a dispute of critical importance and drastic consequence until it was much too late.  As a result, the Court is not satisfied that Lee's trial was a fair one.  Loath as the Court is to disturb a jury's verdict, the errors that went into the verdict are too fundamental to stand. This case is one of the rare ones where an errant verdict must be corrected.

The question is: how?  It would serve neither the parties nor the Court to simply run the trial back with the same fundamental dispute rotting away at the new trial's core.  Perhaps the parties could be admonished to leave the respective credibility of the videos to the jury, but it is difficult to imagine

---

[14] The Court also points out that there were questions of fact precluding a grant of qualified immunity on summary judgment.  *Lee v. City of Troy*, --- F. Supp. 3d ----, 2021 WL 567240, at *10 (N.D.N.Y. Feb. 16, 2021).  Because the Court has vacated the jury's verdict, those questions have now been reopened, and this order is not immediately appealable.  *Bryant v. Egan*, 890 F.3d 382, 386 (2d Cir. 2018) (noting that interlocutory appeal of qualified immunity after post-trial grant of Rule 59 motion is impermissible where factual determination is necessary predicate to applying immunity).

how to police such an order when the individual defendants' narrative is flatly refuted by Lee's version of the video and vice versa.

Instead, the Court sees no choice but to take the respective validity of the videos from the jury's hands. Accordingly, the Court will hold a hearing at 10:00 a.m. on Monday, November 29, 2021, where both sides may present testimony concerning the provenance of their version of the video.[15]  The Court expects that the evidence technician who recovered D-8 and D-9 would testify, as well as Mr. Feit. Both parties may also retain video experts on an expedited basis and notwithstanding Rule 26(a)(2). Even so, they must disclose the reports of any expert they intend to call no later than Monday, November 1, 2021. Once that issue has been resolved, the Court will set a new trial date, with only one version of the video to show the new jury.

Therefore, it is

ORDERED that

1.  Plaintiff Lamont Lee's Rule 50 Motion for Judgment as a Matter of Law notwithstanding the verdict is DENIED;

2.  Plaintiff Lamont Lee's Rule 59 Motion for a New Trial is GRANTED;

3.  The Dkt. 71 judgment and the Dkt. 72 jury verdict are VACATED;

---

[15] Of course, the parties could also either: (1) stipulate to a single version of the video; or (2) settle the case. Either way, a hearing would be unnecessary. If either of these two events come to pass, the parties should notify the Court immediately.

4. An evidentiary hearing concerning the respective credibility of D-8, D-9, and P-12 is set for Monday, November 29, 2021 at 10:00 a.m., at the Utica Federal Courthouse, 10 Broad Street, Utica, New York, 13501; and

5. A new trial will be ordered once the evidentiary hearing has been completed and an order issued.

IT IS SO ORDERED.


Dated:  September 8, 2021
        Utica, New York.

David N. Hurd
U.S. District Judge